# John R. Towle

*v.*

# James Wadsworth.

*Filed at Ottawa October 26, 1893.*

1. CHANCERY—*sufficiency of the evidence—presumption.* Where the testimony of the witnesses in a chancery suit is taken orally in open court, so that the chancellor hears them testify, and the evidence is conflicting, the decree will not be reversed, as being contrary to the preponderance of the evidence, unless such preponderance is clear and undoubted.

2. Where the trial court hears the witnesses give their testimony in a chancery suit, he will occupy a better position to judge of their credibility than an appellate court, and a strong presumption will arise in favor of the finding of the decree, which must prevail unless this court can clearly see that the court below was in error. In such case there is the same necessity as exists on a trial by a jury, that the error in finding as to facts shall be clear and palpable, to authorize a reversal.

3. STATUTE OF FRAUDS—*not applicable to a resulting trust.* The Statute of Frauds is no defense to a bill for the enforcement of a resulting trust.

4. RESULTING TRUST—*purchase made by one on joint account.* Where the defendant, in pursuance of his verbal agreement to that effect, advances the money required to make the first payment on the purchase of land, and such advance is made for himself and the complainant jointly, and he thus, in effect, loans one-half of the money so advanced to the complainant, and pays it to the vendor, and gives his notes for the deferred payments, taking the title in the defendant's name as a security for the repayment of half the purchase money, a resulting trust will arise in favor of the complainant for the undivided half of the property.

5. SAME—*kind and degree of evidence required.* To establish a resulting trust the proof must be full, clear and satisfactory, and it should be received with due caution. But in considering evidence for such purpose two things are to be kept in mind: first, its truthfulness; and secondly, its effect.

APPEAL from the Circuit Court of Cook county; the Hon. MURRAY. F. TULEY, Judge, presiding.

Mr. JULIUS STERN, and Messrs. ASHCRAFT & GORDON, for the appellant:

No contract to purchase on joint account was in fact made. *Byers* v. *Daniel*, 27 Ark. 88; *Corder* v. *Corder*, 124 Ill. 229; *Reynolds* v. *Caldwell*, 80 Ala. 232; *Hyden* v. *Hyden*, 6 Baxt. 406; *Dudley* v. *Bachelder*, 53 Me. 403; *Woodward* v. *Seibert*, 87 Va. 441; *Shaw* v. *Shaw*, 86 Mo. 594; *Boyd* v. *McLean*, 1 Johns. Ch. 582; *Reeve* v. *Strawn*, 14 Ill. 94; *Purcell* v. *Miner*, 4 Wall. 513; *Ridgway* v. *Wharton*, 6 H. L. Cas. 304; 1 Lewin on Trusts, sec. 170.

If the contract was made as alleged, Towle did not purchase in pursuance of it. *Reeve* v. *Strawn*, 14 Ill. 97; *Stephenson* v. *Thompson*, 13 id. 186.

The facts in this case do not bring it within *Wallace* v. *Carpenter*, 85 Ill. 590. *Levy* v. *Brush*, 45 N. Y. 589; *Botsford* v. *Burr*, 2 Johns. Ch. 405; *Smith* v. *Burnham*, 3 Sumn. 433; *Page* v. *Page*, 8 N. H. 187; *Perry* v. *McHenry*, 13 Ill. 227; *Wilson* v. *McDowell*, 78 id. 514; *Wetmore* v. *Newberger*, 44 Mich. 363; *Lantry* v. *Lantry*, 51 Ill. 458; *Holmes* v. *Holmes*, 44 id. 168; *Roberts* v. *Ware*, 40 Cal. 634; *Raub* v. *Smith*, 61 Mich. 543; 2 Story's Eq. Jur. 1201 a; Sugden on Vendors, 911; 2 Washburn on Real Prop. (3d ed.) 444.

The decree can not be sustained on the ground that the deed was a mortgage. *Walter* v. *Klock*, 55 Ill. 362; *Lathrop* v. *Hoyt*, 7 Barb. 59; *Stephenson* v. *Thompson*, 13 Ill. 186.

The decree can not be sustained on the ground of agency or fraud. *Rogers* v. *Simmons*, 55 Ill. 76; *Burden* v. *Sheridan*, 36 Iowa, 125; *Robertson* v. *Robertson*, 9 Watts, 32; 2 Story's Eq. Jur. sec. 1201 a.

Mr. JOHN WOODBRIDGE, Mr. T. A. MORAN, and Messrs. ALDRICH, PAYNE & DEFREES, for the appellee:

The finding of the chancellor, where the testimony is oral, is entitled to the same weight as the verdict of a jury. *Coari*

v. *Olsen,* 91 Ill. 277; *Long* v. *Fox,* 100 id. 43; *Cunningham* v. *Brown,* 44 Wis. 72; *Johnson* v. *Johnson,* 125 Ill. 514.

The facts show a resulting trust in favor of Wadsworth as to the undivided half of the property. *Wallace* v. *Carpenter,* 85 Ill. 590; *Delahay* v. *McConnell,* 4 Scam. 157; *Tillson* v. *Moulton,* 23 Ill. 648; *Coats* v. *Woodworth,* 13 id. 657; *Smith* v. *Sackett,* 15 id. 528; *Davis* v. *Hopkins,* id. 519; *Reigard* v. *McNeil,* 38 id. 401; *Morgan* v. *Clayton,* 61 id. 39; *Campbell* v. *Dearborn,* 109 Mass. 130; Rev. Stat. chap. 95, sec. 12.

Mr. Justice Bailey delivered the opinion of the Court:

This was a bill in chancery, brought by James Wadsworth against John R. Towle, in which the complainant claims to be the equitable owner of an undivided one-half of certain lots of land in the city of Chicago, the legal title to which is in the defendant, and praying for a conveyance of the legal title, for an accounting and partition, and for an injunction restraining the defendant from prosecuting certain actions of ejectment and of forcible detainer brought to obtain possession of the premises, and certain actions for rents claimed to be due from the complainant. The defendant answered denying that the complainant had any equitable interest in the lots in question, and pleading the Statute of Frauds. He also filed a cross-bill, alleging that he had purchased the premises and was the legal and equitable owner thereof, and praying that a certain paper reciting and declaring that the defendant held the legal title to an undivided one-half of the lots in trust for the complainant, which the complainant had placed on record in the office of the recorder, be set aside and cancelled as a cloud upon the defendant's title. The cross-bill was duly answered, and the cause being heard on pleadings and proofs, the evidence of the witnesses being taken in open court before the chancellor, the cross-bill was dismissed for want of equity, and a decree was entered in favor of the complainant in accordance with the prayer of the original bill.

In 1859, Wadsworth, who was then the owner of the lots in question in fee, erected a dwelling house thereon, and has occupied the premises as the residence for himself and family from that time to the present, and is still in possession. In 1873, he borrowed $12,000 of the Chicago Theological Seminary, and to secure such loan, he, together with his wife, executed a deed of trust conveying the lots to Oswell A. Bogue, as trustee. In 1877, the deed of trust was foreclosed by sale under the power therein contained, and a trustee's deed was executed conveying the lots to the seminary. The seminary continued to own the property from the date of the foreclosure down to January, 1886, the date of the transactions out of which the present controversy arose. During that time Wadsworth occupied the premises under successive annual leases from the seminary, sometimes paying the rent, and sometimes giving his promissory note for it, the rent reserved being $360 per year for a part of the time, and $300 for the residue.

On the 28th day of January, 1886, as the result of certain negotiations, in which it is admitted Wadsworth took some part, an agreement was entered into between the seminary, through its committee, and Towle, the defendant, by which the seminary agreed to sell the lots in question to Towle for $12,000, of which $2000 was to be paid in cash on delivery of the deed, and $2000 in one year, $2000 in two years, and $6000 in five years, from March 1, 1886, the deferred payments to be secured by Towle's notes and a deed of trust on the premises, the sale to be subject to certain assessments then due, and to the lease to Wadsworth expiring May 1, 1886, and it was provided that certain portions of the property should be released at certain rates per front foot, upon proper payments being made on the notes. It was provided that abstracts of title should be furnished by March 1, 1886, and $250 on account of the purchase money was receipted on the contract as paid.

Before March 1, 1886, Towle sold a portion of the property to Evers for $2500 cash. The terms of the contract between the seminary and Towle were thereupon somewhat modified, and it was finally carried out in the following way : the seminary conveyed to Evers the part sold to him, and conveyed the residue to Towle, and Towle paid to the seminary, in addition to the $250 already paid, the sum of $3900 in cash, and gave his two notes, one for $1850, payable two years after date, and one for $6000, payable five years after date, with interest at the rate of six per cent per annum, both being secured by a deed of trust on the part of the property conveyed to Towle.

It is not claimed that there is any written evidence of the equitable title which Wadsworth is seeking to enforce, the theory of the bill being, that there was a resulting trust in Wadsworth's favor as to one-half of the property purchased by Towle of the seminary. The allegations of the bill on this point are, in substance, that after the foreclosure of the deed of trust, Wadsworth conversed from time to time with the representatives of the seminary in reference to a redemption or repurchase of the property ; that on the 18th day of January, 1886, he conferred with the trustees of the seminary, presenting to them a letter from Lucius G. Fisher, one of their number, and that at that conference, the trustees proposed to sell the property to him, Wadsworth, or to any person he might produce, for $12,000, one-fourth cash or convertible securities, and the balance in one, two and three years, with semi-annual interest, but power was given to the committee of the trustees to vary these terms if necessary and advisable, the proposition to hold good until January 25, 1886 ; that he called upon the board in consequence of an arrangement made between him and Towle ; that prior to that date Towle called upon him and requested him to agree that he, Towle, should participate in the purchase of the premises, each to own an undivided one-half thereof, Towle to furnish

all the money to make the first payment, one-half of which was to be loaned to Wadsworth, and applied in payment of Wadsworth's share of the first installment of the purchase money, and to be repaid on or before two years thereafter, Towle to hold the title of Wadsworth's half as security for the payment of the money so loaned; that after receiving the above mentioned proposal from the seminary board, Wadsworth completed his arrangement with Towle and accepted his proposition, and thereupon they purchased the lots from the seminary for $12,000; that soon after the purchase, Towle sold to Evers a portion of the property for $2500 and paid to the seminary that sum and enough more to make $4150, and, thereupon, acting on behalf of himself and Wadsworth, he secured the residue of the consideration by his two notes and a deed of trust on the property; that since the purchase, Towle has made various sales to different parties, and has received therefrom various sums of money which should be credited to Wadsworth; that in making the purchase, Towle acted for himself and Wadsworth, and took the title in his own name in pursuance of the agreement to hold Wadsworth's half as security for the money loaned to him, and used in completing the purchase of the premises.

The case thus made by the bill is denied by the answer, and the issues thus formed are issues of fact, to be determined by the testimony of the witnesses. The principal witnesses were the parties themselves, and to a very considerable extent their testimony is in conflict, and the decision of the case must depend largely if not wholly upon the conclusion to be drawn from their respective versions of the circumstances out of which the controversy has arisen.

Wadsworth's testimony is substantially as follows: After the foreclosure, I frequently talked with the officers of the seminary in relation to re-purchasing the property. My principal talk was with Mr. Fisher, one of their directors, who lived in Hyde Park near the property, and who seemed, by the

way he acted, to have the care and custody of the property delegated to him.   He told me that if I could find a person who would purchase the property at $12,000, the amount of the loan, to come to him and he would see that I got it.   I had one, two, or perhaps three conversations of that kind with him.   On the 18th day of January, 1886, Towle came up to me on the Hyde Park train as we were coming to Chicago, and inquired what arrangements I had about the purchase or repurchase of the property from the parties who held the title. I said: "I know just what I can do."   He said: "What can you do?" and I said: "I can buy the property for $12,000." He then asked: "How much cash will they want down?" and I said: "They will want $3000."   He asked: "How will they want the rest paid?" and I replied: "They will want $3000 more in a year, and the remainder can run as long as we want it, at six per cent interest."   He then said: "You see what you can do, and if you can do that, I will furnish the money, and we will take it together, and I will give you two years' time on your half."

We came along to town, and I went to his place of business and saw him again.   What the particular conversation was at that time, as distinguished from the other, I am unable to remember.   I then went back to Mr. Fisher's house and told him what had occurred between me and Towle, and he said that the seminary board had a meeting that day, but that his health was such that he could not attend.   I asked him to give me a letter to the directors of the seminary, which he did. I do not think it was an open letter, or that I ever knew its contents.   I came back to town that afternoon and went to the office of the seminary, and found the following gentlemen present, viz., Messrs. Gates, Blatchford, Holden, Savage and Hollister.   Hollister was their treasurer, but I do not know that he was a director.   I presented Mr. Fisher's letter.   They seemed to be occupied when I went in, but they dropped what they had in hand, and after holding a whispered consultation

together a little distance from where I was, they came to me and gave me the terms upon which they would sell the property, of which I wrote down, in their presence the following memorandum:

"*Mem.*                                      "CHICAGO, *Jan. 18, 1866.*

"The ex. com. of Chi. Theological Seminary propose to sell the Wadsworth property for $12,000, net, ¼ cash and such undoubted securities as shall be satisfactory to Messrs. Hollister & Holden, our spl. com., and can be at once converted into cash; and bal. in 1, 2 and 3 years, with interest at 6 per annum, payable semi-annually, with power to committee to vary this if necessary and advisable in their judgment. This proposition to hold good until the 25th day of January inst."

The board of directors seem to have taken a letter-press copy of what appears to be a duplicate of this memorandum, though in another hand-writing, but the witness is unable to explain how they obtained such copy, as he says that he did not read it over to them, and did not know that they kept a copy.

He further testifies that he put the memorandum in his pocket and went home, and the same day went to Towle's house and showed it to him; that Towle said: "That is all right;" that Towle came to the witness' house the same evening; that he is unable to state at which of these conversations the following conversation took place, but swears positively that it did take place at one of them. That conversation, as related by the witness, was as follows: I showed him the paper, and he said: "That is all right. But now I wish you would give me a letter of introduction to them. I want to see if I can not make an arrangement with them to purchase with a down payment of only $2000, and if I can do that, then I can expend a thousand dollars on the house, and make two tenements of it, and in that way, we can rent one of the tenements for money enough, or partly enough to pay the interest on the back payments, and you can occupy the other." So

I gave him a letter of introduction that evening to the secretary or treasurer of the seminary, I can not say which. I think this all occurred on the 18th of January. I saw Towle four times, first on the train, second at Carson, Pirie, Scott & Company's where he was doing business, third at his house, and fourth at my house.

The next time I saw Towle was perhaps the next day or the day after, or might have been two or three days, and he said that he had bought the property for $12,000, and had sold the south fifty feet to Mr. Evers for $2500, and had paid that sum on the purchase. I saw him afterwards, and he said that he had talked over several other sales, but none of them had been completed.

Wadsworth further testifies that, at the conversation with Towle at Carson, Pirie, Scott & Company's, he remarked to the defendant that within two years he could realize on some cattle or other stock he had on a farm with which to make payment of one-half of the purchase money, but does not recollect telling him that he had a stock farm, it being in fact a farm which the complainant had rented, nor did he tell Towle that the cattle and other stock were mortgaged for $6000.

The testimony of the defendant, on the other hand, is in substance as follows: My attention was first called to this property by Mr. True, about the 10th or 15th of December, 1885, it might have been a few days earlier. He said that the property was for sale, and had been offered to him; that it could have been bought for $11,000, but he believed they wanted $12,000 for it. A few days afterward, I saw Mr. Wadsworth on the depot platform at Woodlawn Park. At that time I had not been to look at the premises. I stepped up to where Mr. Wadsworth stood and, after passing the time of day, I said: "I understand the property you occupy is for sale at $12,000. Are you expecting or have you made any arrangements to buy it?" He said "No." He said he would like very much to buy it, but his financial condition was not such as to

warrant him in making the purchase; that he owned a large stock farm and a large amount of cattle, of the value of several thousand dollars, but the stock was not in a condition to sell, and if he was to dispose of it at that time to raise the necessary amount of money, it would cause a large loss to him. I said to him: "Mr. Wadsworth, if I could arrange to make the purchase, furnishing the first money, how would it suit you to have me buy it, and we carry the property together?" That seemed to please him very much. He said he would like it very much, and said all he could to encourage me to make the purchase. Our conversation was very short. I said: "We will see." Neither he nor I knew at that time that it could be bought for $12,000, and he suggested that he would go and see the seminary officers. That was not later than along about the 20th of December. Mr. Wadsworth took the train and I did not.

At that time I did not agree to buy and advance the first payment on joint account of myself and Wadsworth. I said nothing on that occasion more than I have stated, viz., that he should go and ascertain the facts, and I would see what I could do. I think Wadsworth reported that evening or the next day at my house, that he had seen one of the seminary officials, and that they would sell the property for $12,000. I had no conversation with him about this property on the train from Woodlawn to Chicago, before I got the deed. At the time he came to my house very little was said. I answered the door bell myself, and he simply informed me that the property could be bought for $12,000, and I think I said I would see, because at that time I did not know that I would be able to buy the property.

About three days afterwards, I went over myself and called upon Hollister at the Theological Seminary. Wadsworth did not write me a letter of introduction to Hollister or anybody else, in relation to this matter, that I remember. I found out that they were anxious to sell the property, and if satisfactory

terms could be arranged, he thought they would sell for $12,-
000, and Hollister arranged a meeting between himself, Hol-
den and myself at Holden's office, 125 LaSalle street. Being
busy through the week, I had the meeting postponed to the
following Saturday. That was not far from the 1st day of
January. I kept the appointment, and we went over the con-
tract. I had in the meantime seen the Building and Loan
Association, and found that I could borrow $2000 on my house,
in addition to the incumbrance already on it. I told Holden
and Hollister that I could raise $2000 in money, and would
pay that when a deed was executed.

They said it would be necessary for me to buy the property
subject to a lease, but hoped, if I bought, I would have better
luck with my tenant than they had had. I knew of course
who their tenant was, but being interested in their statement,
I inquired what they meant, and they said that Mr. Wadsworth
had occupied the house since the foreclosure, and had never
paid any rent, except by giving his notes; that they had given
him credit from time to time on the statement made by him
that he held a large amount of stock on a stock farm, and they
had accepted this statement so often that it had become mo-
notonous, and they looked the matter up to see if they could
not collect, and found that the property was largely mort-
gaged. I don't think they said anything about the farm.
Think I stated to Hollister and Holden that I had thought
about banking on that stock farm myself, and if that was the
case, I did not think I should take any further risks.

They were unable at that time to close the contract with
me, Mr. Holden stating that it would be necessary to submit
the matter to the next regular meeting of the board, which
occurred some days later, and after the meeting of the board
I called upon Mr. Holden at his office, and was informed that
the power to act had been delegated to Holden and Hollister
in the matter of selling the property on the terms they con-
sidered for the interests of the seminary. They undertook to

get $3000 cash, but I informed them that, in order to take, the property, I would have to buy it on my own terms, and that I would like the property if I could get it on those terms. They thought the matter over, and I think I met them at another time a day or two afterward, and they decided to let me have the property, and a contract was drawn up and signed a day or two later.

At the date of the contract $250 was paid. I did not pay that money on account of myself and Wadsworth. I have not at any time promised or agreed with Wadsworth that I would buy the property on our joint account. I had no conversation with him in reference to the property that I remember, except those which I have detailed. In my first conversation with him, my intention was to probably buy the property and allow him to be interested until I found out about the stock farm. Up to that time I was figuring to buy the property and making my arrangements, and if I had found out nothing in regard to Wadsworth, I should very likely have seen him again and entered into a contract with him to purchase the property, because I needed assistance in the purchase. On learning of the chattel mortgages, I made up my mind that if I bought the property, I would buy for myself.

On cross-examination on this point he said: I never consummated any arrangement with Mr. Wadsworth; I never made a regular agreement or contract. I asked him at the time he made this statement how it would suit him for me to go in, and I carried the idea along, until I got the information from the seminary people about Mr. Wadsworth's condition. Before I got the information, I didn't tell him I would go in, except on the first day it might be assumed that if everything was right, we would go in together. I don't remember that I told him so. He further testifies that, after he had made up his mind not to consummate the arrangement with Wadsworth, he did not go back and tell Wadsworth of his conclusion; that he made up his mind that he had had

enough to do with Wadsworth, but did not notify him in any way. He does not remember that he told Wadsworth that he had bought the property, or anything about it.

The complainant also testifies that the defendant never gave him any notice of his determination not to carry out the original arrangement to purchase the property on joint account. The evidence is undisputed that the complainant remained in possession of the dwelling house, and that no demand for possession, or for the payment of rent was made by the defendant until nearly sixteen months after the purchase was consummated by the defendant.

The testimony of the complainant is corroborated by that of Edwin J. Wilbur, who testifies to a conversation with the defendant sometime after the purchase in which he said to the defendant: "I understand you have been investing in our neighborhood, and that you have been buying the Wadsworth property," to which the defendant made some reply which the witness does not remember; whereupon the witness further remarked: "I understand you and Wadsworth are going to handle the property together; divide it up and improve it or sell it," to which the defendant replied, in substance, that he had made arrangements to handle the property in connection with Wadsworth.

After carefully considering all the evidence, we are of the opinion that, upon its face, as it appears in the record here on appeal, the clear preponderance is in favor of the version of the transactions in question given by the complainant. His version is clear, circumstantial, consistent and reasonable. The defendant's testimony it is true, may be equally circumstantial, but while he insists that no formal assent was given by him to the pending proposition that he purchase the property for the joint benefit of himself and the complainant, his testimony shows that what he said was fairly calculated to leave the impression on the complainant's mind that he had given his assent to such agreement, and on cross-exam-

ination he is forced to admit that from what he said in the first conversation, it might be assumed—and the complainant had therefore the right to assume—that they would go into the transaction together if everything was right, and that, without any change in his apparent attitude towards the complainant, and without any notice to him that anything was wrong, he went on, apparently in pursuance of the understanding between him and the complainant, and made the purchase, and afterwards held the title for nearly sixteen months before intimating to the complainant that the purchase was made otherwise than for their joint benefit. It will thus be seen that, taking his own testimony as true it goes very far towards establishing the complainant's theory of the transaction. The proposition to purchase for the joint benefit of himself and the complainant was his own, and while he claims that it was made in such form as not to amount technically to a contract, yet he admits that his conversation and conduct were such as to "carry that idea along," and to furnish sufficient basis for assuming that, if everything was right, his proposition would be carried out. When he ascertained, or supposed he had ascertained, that the complainant had not the financial ability which he had been led to believe, it was clearly incumbent upon him, in order to relieve himself from the position and duties which he had thus assumed, to notify the complainant of his decision to go no further in the prosecution of their joint enterprise. But he did nothing of that kind. His decision to make the purchase on his own individual account was kept secret, the complainant-supposing, and as the defendant is forced to admit, having reason to suppose, that the purchase was being made for their joint account, in accordance with the defendant's proposition in that behalf.

The same conclusion is strengthened by the further fact, already mentioned, that for nearly sixteen months after the purchase, the defendant permitted the complainant to con-

tinue to occupy the dwelling house on the premises as a residence, in the supposition that he was in possession by virtue of his right as the equitable owner of an undivided one-half of the property, and without charging him rent, or claiming a paramount title in himself, thus leading the complainant to suppose, during all that time, that the purchase had in fact been made in pursuance of the defendant's original proposition, for the joint account of himself and the complainant. If to the foregoing is added the defendant's admission, made long after the purchase, that he had made arrangements to handle the property in connection with the complainant, as testified to by witness Wilbur, the theory sought to be sustained by the defendant's testimony is greatly impaired, and that sustained by the complainant's testimony to the same degree corroborated.

But the fact should not be lost sight of that the testimony of the two principal witnesses, as well as that of most of the others, was taken in open court, and that the chancellor who rendered the decree had an opportunity to see the witnesses and hear them testify, and was thereby furnished with a very important means of judging of their relative fairness, candor and credibility which is not at our command. Under these circumstances, the decree should not be reversed as being contrary to the preponderance of the evidence, unless such preponderance is clear and undoubted. In *Schoonmaker* v. *Plummer*, 139 Ill. 612, which was a bill brought to enforce an alleged parol gift of real estate, the testimony of the principal witnesses was directly conflicting and the main contention was that there was no such clear and satisfactory proof of the gift as entitled the complainants to a specific performance. In discussing the propriety of the decree we said: "The testimony of the parties to the alleged gift is directly in conflict, the one affirming and the other denying it. As their testimony, as well as that of the other witnesses, was delivered orally in open court, the court below had an opportunity to

see them and hear them testify, and was accordingly in a much better position to judge of their relative credibility than we can be. A strong presumption is thus raised in favor of the findings of the decree, so far as they relate to questions upon which the evidence is conflicting, and that presumption must prevail, unless we are able to see that the court was clearly and manifestly in error."

In many cases, the rule that the finding of the chancellor, when the testimony is oral, must be received with strong presumptions in its favor, is referred to substantially the same rule which prevails in case of the finding of a jury upon conflicting evidence. Thus, in *Coari* v. *Olsen*, 91 Ill. 277, where the testimony was oral, it was said : "The chancellor had the same facilities for forming an opinion of the relative merit and weight of the testimony given by the several witnesses, as has a jury in trials at law, and there is therefore the same necessity as exists on a trial by jury, that the error in finding as to facts shall be clear and palpable, to authorize a reversal." To similar effect see *Long* v. *Fox*, 100 Ill. 43 ; *Johnson* v. *Johnson*, 125 id. 514; *Cunningham* v. *Brown*, 44 Wis. 72.

If governed by considerations growing out of this rule alone, it would be difficult to find any tenable ground for disturbing the findings of the court below as to the facts. But when it is further seen, as we have attempted to show, that those findings are in accordance with the clear preponderance of the evidence as it appears in the record, it is manifest, without further discussion, that those findings must be sustained, and if they are sufficient to entitle the complainant to the relief prayed for in his bill, the decree must be affirmed.

The court below having found, in substance, that the complainant's account of the transactions out of which the controversy arose is the true one, and, consequently, that the account given by the defendant, so far as it conflicts with the complainant's testimony, is untrue, in determining the propriety of the decree, the defendant's testimony may be left

out of the account and disregarded. The only question then is, whether the complainant has made out such a case as will support the decree.

The bill sets up and seeks to enforce a resulting trust. As such trusts are expressly excepted from the operation of the Statute of Frauds, the defense set up by pleading that statute need not be noticed. The complainant's theory is, that the defendant, in pursuance of his agreement in that behalf, advanced the money required to make the first payment for the property, and that he made such advance for himself and the complainant jointly, and thus, in effect, loaned one-half of the money thus advanced to the complainant, and paid it to the seminary in purchase of the property as the complainant's money, taking the title in his own name as security for its repayment. That these facts, if true, raised a resulting trust in favor of the complainant is too well settled to require discussion. The following cases illustrative of the rule may be consulted: *Wallace* v. *Carpenter,* 85 Ill. 590; *Reeve* v. *Strawn,* 14 id. 94; *Davis* v. *Hopkins,* 15 id. 519; *Reigard* v. *McNeil,* 38 id. 400; *Ferguson* v. *Sutphen,* 3 Gilm. 547.

We are of the opinion that, assuming the truth of the complainant's testimony, it is sufficient to establish a resulting trust of the character of the one alleged in the bill. We fully recognize the rule that proof, to establish such trust, must be full, clear and satisfactory, and that it should be received with due caution, but in considering evidence for such purpose, two things are to be kept in mind, first the question of its truthfulness, and secondly of its effect. The court below has found that the version of the transactions given by the complainant is the true one, and we see no ground for impeaching that finding. Taking it then as true, the resulting trust alleged is fully, clearly and satisfactorily established.

Entertaining these views of the case, our conclusion is, that the decree of the Circuit Court must be affirmed.

*Decree affirmed.*

Mr. Chief Justice Magruder, dissenting:

This is a bill filed by appellee against appellant, in which the appellee claims to be the equitable owner of one-half of certain lots, the legal title to which is in appellant, and asks for an accounting and partition, and for an injunction against certain actions of ejectment and forcible entry and detainer brought by appellant for the possession of the premises, and also certain actions brought for rents claimed to be due from appellee.

The answer denies that the complainant has any interest in the property, and pleads the Statute of Frauds. The defendant below, the appellant here, filed a cross-bill, setting up that he had bought the premises and is the legal and equitable owner thereof, and praying that a certain paper, recorded by complainant, and reciting that defendant held the legal title to one-half of the lots in trust for the complainant, should be set aside as a cloud upon the cross-complainant's title, etc. The decree of the Circuit court dismissed the cross-bill, and found for the complainant in the original bill, in accordance with the prayer thereof.

In 1859, appellee, being the owner of the lots in question, built a house thereon, and has lived there with his family ever since, and is still in possession. In 1873 he executed a trust deed to one Bogue, as trustee, to secure an indebtedness of $12,000.

This trust deed was foreclosed in 1877, and in pursuance of the trustee's sale a trustee's deed, dated April 21, 1877, was executed to the Chicago Theological Seminary. The seminary continued to own the premises from April 21, 1877, until the contract was made with appellant in January, 1886, as hereinafter stated. During the period from the trustee's sale to May 1, 1886, appellee occupied the premises under lease from the seminary, sometimes paying them rent and sometimes giving his notes for overdue rent, at the rate of $300 or $360 per year.

7—147 Ill.

On January 28, 1886, a written contract was made between the board of directors of said seminary and the appellant, by which the board agreed to sell and convey the lots to him for $12,000 to be paid as follows: $2000, in cash upon the delivery of a warranty deed, a note for $2000, payable in one year from March 1, 1886, a note for $2000, payable in three years from said date, and a note for $6000, payable in five years from said date, the note to be secured by trust deed upon the property with the privilege of paying the first two before maturity, the sale to be subject to certain assessments then due and to the lease to Wadsworth expiring on May 1, 1886, certain portions of the property to be released at a certain rate per front foot upon payments being made upon the notes; abstract of title to be furnished by March 1, 1886, a receipt of $250 on account of the purchase money is acknowledged in the contract.

Before March 1, 1886, Towle sold a portion of the property to one Evers for $2500 in cash. In March or April, 1886, the terms of the contract were somewhat modified, and it was carried out in the following way: the board executed a deed to Evers for the part sold to him, and a deed for the balance to Towle, and Towle paid to the board, in addition to the $250 above named $3900 in cash, and gave his two notes, one for $1850 and one for $6000, both dated March 1, 1886, and payable, the first in two years after date, and the second in five years after date, with six per cent interest, and both secured by trust deed upon the property conveyed to Towle.

There is no written evidence in the record of the ownership by appellee of any title or interest of any kind in said premises. His claim of interest rests entirely upon parol testimony. His theory is that there was a resulting trust in his favor as to one-half of the property purchased by appellant from the seminary.

If the proof showed that he paid one-half of the purchase money there would be no doubt about the existence of such

resulting trust; but the proof does not so show, nor is it contended that he paid any part of the purchase money. His contention is that there was a joint purchase of the premises by himself and appellant; that Towle agreed to advance for him one-half of the amount to be paid in cash; in other words, that there was a loan to him by appellant of the amount necessary to make one-half of the cash payment. It is not claimed that any arrangement was made as to the assumption by the appellee of any of the notes for the deferred payments, or that the parties were to make sales and meet the notes with the proceeds of such sales.

Inasmuch as the contract and deed were executed to appellant, the presumption is that appellant purchased the property with his own money. In order to overcome this presumption by parol testimony, the proof "should be so convincing as to leave no reasonable doubt in the mind of the court." (*Reeve* v. *Strawn,* 14 Ill. 94.)

Parol proof to establish a resulting trust must be full, clear and satisfactory, and must be received with great caution. (*Corder* v. *Corder,* 124 Ill. 229; *Purcell* v. *Miner,* 4 Wall. 513; *Shaw* v. *Shaw,* 86 Mo. 594; *Woodward* v. *Sibert,* 82 Va. 441; *Byers* v. *Daniel,* 27 Ark. 88; *Reynolds* v. *Caldwell,* 80 Ala. 232; *Dudley* v. *Bachelder,* 53 Me. 403.)

This rule is especially applicable, where it is admitted that the party claiming the equitable title has not paid any part of the purchase money, and where it is claimed that the alleged *cestui que trust* has borrowed the money to make the purchase, either in whole or in part, from the party taking the legal title, or has made an agreement with the latter for an advance of the purchase money. (*Boyd* v. *McLean,* 1 Johnson's Chan. Rep. 582; *Getman* v. *Getman,* 1 Barb. Ch. Rep. 499; *Millard* v. *Hathaway,* 27 Cal. 119; *Fickett* v. *Durham,* 109 Mass. 419; *Levy* v. *Brush,* 45 N. Y. 589; *Page* v. *Page,* 8 N. H. 187; *Roberts* v. *Ware,* 40 Cal. 634; *Wetmore* v. *Neuberger,* 44 Mich. 362; *Raub* v. *Smith,* 61 id. 543; *Bottsford* v. *Burr,* 2 Johns.

Ch. 405; *Wilson* v. *McDowell,* 78 Ill. 514; *Lantry* v. *Lantry,* 51 id. 458; *Holmes* v. *Holmes,* 44 id. 168.)

Let us see what the facts are, to which the principles announced in the authorities above referred to are to be applied.

The complainant swears that Fisher, one of the directors of the seminary, had told him the property could be bought for $12,000; that thereafter on January 18, 1886, the defendant Towle, came to him on the Hyde Park train on his way to Chicago and asked him what arrangements he had made for the purchase of the property; that he replied: "I know just what I can do. I can buy the property for $12,000, $3000 cash and $3000 more in one year, and the remainder can run as long as we want it at six per cent interest." That Towle then said: "You see what you can do. If you can do that, I will furnish the money and we will take it together, and I will give you two years' time on your half;" that complainant went to a meeting of the seminary board in session on that day and obtained from it a proposition to sell the property for $12,000, one-fourth in cash, or securities convertible into cash, and the balance in one, two and three years, at six per cent per annum, payable semi-annually, the proposition to hold good until January 25, 1886, with power in the executive committee of the board to vary it if necessary and advisable in their judgment; that the complainant showed this proposition which he himself had written down as the members of the board stated it, and which did not mention the name of complainant or of any particular purchaser to the defendant, Towle, on the evening of said January 18 and Towle said, "that is all right;" that on the said evening defendant asked complainant for a letter of introduction to the seminary directors, so that he might make an arrangement with them, if possible, to accept $2000, instead of $3000, as the cash payment; that complainant gave him a letter to the secretary or treasurer of the board; that the next time complainant saw Towle, *perhaps the next day or second day,* he said: "I bought

the property for $12,000, and have sold the south fifty feet
to Evers for $2500, and paid the $2500 on the $12,000 pur-
chase."

The defendant swears, that he learned that the property
was for sale for $12,000, from a real estate agent named
True, early in December, 1885; that he had no conversation
with complainant on the train; that he at no time agreed with
complainant to buy the property on their joint account; that
he did not pay the $250 paid on January 28, 1886, upon the
joint account of himself and Wadsworth; that he paid all the
money which he did pay for himself alone; that about De-
cember 20, 1885, he met Wadsworth for a few moments on
the platform at Woodlawn Park, and told him he had under-
stood the property was for sale at $12,000, and asked him if
he expected to buy it or had made any arrangements to buy
it, to which Wadsworth said "no," that he would like to buy
it, but was not in such shape as to be able to make the pur-
chase, that he owned a stock farm and a large amount of stock
which was not then in a condition to be sold, and a sale of
which at that time would necessitate a large loss; that de-
fendant then said to Wadsworth: "If I could arrange to make
the purchase, furnishing the first money, the necessary money
on the first payment, how would it suit you for me to buy it,
and we could carry the property together;" that complainant
said he would like to buy it in that way, and defendant said :
"We can see;" that complainant suggested that he would see
the officers of the seminary; that complainant came to defend-
ant's house that evening and told him the property could be
had for $12,000, and defendant said he would see about it;
that complainant did not give defendant any letter of intro-
duction as claimed; that defendant called on Hollister, one
of the directors of the seminary, on December 22, 1885, and
made an appointment to meet him and Holden, another di-
rector; that he met them and learned that, if the sale was
made, it would be subject to a lease to Wadsworth, and that

Wadsworth had failed to pay his rent, and had given notes for the rent, and that the stock on his farm was mortgaged for $6000; that defendant concluded to take no further risks with complainant because of the information thus received as to his inability to pay the notes and as to the mortgage on his stock; that defendant then made up his mind to have nothing more to do with complainant in the purchase, and finally made a contract with Hollister and Holden for the purchase of the property as above stated.

The only direct testimony as to an agreement for the joint purchase of the property is that of the parties themselves, and they contradict each other. Holden and True sustain the statements of appellant as to what occurred between them and him.

One Wilbur gives a deposition, in which he states, that, about three years before the date of his testimony, he heard Towle say, that he had made arrangements to handle the property in connection with Wadsworth. But where the question is, whether the holder of the legal title has paid his own money for the purchase of the title for himself, or whether he has taken such title as sucurity for a loan of money advanced to enable another person to make the purchase so as thereby to create a resulting trust in the nature of a mortgage, the character of the transaction cannot be determined by evidence of declarations made by the holder of the legal title to outside parties in chance conversation, "which the witness had no reason to recollect from interest in the subject-matter, which may have been imperfectly heard, or inaccurately remembered, perverted, or altogether fabricated; testimony, therefore, impossible to be contradicted." (*Purcell* v. *Miner, supra.*)

In *Reeve* v. *Strawn, supra,* it was held that a resulting trust could not be established by oral testimony which consisted of "ambiguous expressions and uncertain declarations made by

the parties sought to be charged, and testified to by witnesses after the lapse of several years." ❊　❊　❊

It is said, that appellant never informed appellee that he intended to make the purchase for himself after he learned of appellee's financial inability to furnish one-half of the purchase money. Appellee's own testimony shows, that appellant told him of his purchase from the directors and of his payment to them of the money received from Evers. If the cash payment of $2000 was made with the proceeds of the sale of a part of the land, it was not made with money loaned by appellant to appellee.

Nor can the allegation of the bill, that appellant held the title to one-half of the property as security for the loan of one-half of the first payment to appellee, be true when it appears that a part of the property was deeded to Evers, and appellant never did hold the legal title to the portion sold to Evers.

Besides the sale to Evers, appellant sold another part of the property in March or April, 1886, for $2000, to one Barber. In June, 1886, he sold another portion for $2000 on time to one Fish. In May, 1887, Fish assigned his contract to appellee, who assumed the payment of $1500 of the purchase money, and swears that he paid the amount in full to appellant. I am unable to understand why appellee thus bought and paid for one of the lots if he regarded himself as the owner of half of it, without taking some measures to see that proper credits were made upon the alleged joint purchase. His conduct in this matter amounted in some respects to a recognition of appellant as the sole owner of the property.

At any rate, without going further into the evidence, it is sufficient to say that the two parties, who alone knew what the arrangement was, contradict each other in reference to it, and there is as much testimony tending to confirm the statements of the one as there is testimony tending to confirm the

statements of the other. Under these circumstances it is impossible to say that the existence of a resulting trust is established by such clear and satisfactory proof as the law demands in such cases.

In order to constitute a resulting trust, there must be proof of ownership of the funds at the time purchase is made. Such a trust arises by operation of law, and does not spring from the previous contract of the parties. (*McDonald* v. *Stow*, 109 Ill. 40.) Here, however, the proof does not show that a loan of a part of the money necessary to purchase the property was made at the time of the purchase. If the evidence conclusively proves anything, it proves a parol contract entered into by the parties before the purchase, by the terms of which one was to purchase one-half of the land for the use and benefit of the other.

The contract is consequently nothing more than a simple parol agreement for the purchase or sale of land, which is cut off by the plea of the Statute of Frauds. *Reeve* v. *Strawn*, *supra.*

Not only is a verbal contract for the sale of lands void, but a verbal agreement by one to purchase an interest in lands for another is void. *Raub* v. *Smith*, *supra.*

While it may be wrong in point of morals to violate such a parol agreement, yet its violation is not a fraud against which a court of equity will furnish relief when the Statute of Frauds is pleaded.

Mr. Justice Craig, also dissenting.