T.C. Memo. 1999-145

UNITED STATES TAX COURT

ESTATE OF LUCILLE M. HORSTMEIER, DECEASED, MARY E. SCOTT,
EXECUTOR, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19908-96.                    Filed April 30, 1999.

<u>David E. Alms</u>, for petitioner.

<u>William T. Derick</u>, for respondent.

MEMORANDUM OPINION

GALE, <u>Judge</u>:  Respondent determined a deficiency in Federal
estate tax in the amount of $208,380.

The sole issue for decision[1] is whether 50 percent or 100
percent of the value of certain real property referred to as the

-----

[1] The parties filed a stipulation of settled issues
resolving the remaining issues.

Glenview house is included in the taxable estate of Lucille M. Horstmeier.

Background

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts and the attached exhibits. At the time the decedent, Lucille M. Horstmeier (Ms. Horstmeier), died she resided in Glenview, Illinois. At the time of filing the petition, the executor, Mary E. Scott (Ms. Scott), resided in Palatine, Illinois.

Ms. Scott and Ms. Horstmeier lived together for almost 20 years before Ms. Horstmeier's death in 1993. They had met in December 1972 while Ms. Horstmeier was vacationing in Florida. At that time, Ms. Horstmeier lived in Skokie, Illinois, with Mae Glassbrenner, her business partner with whom she owned and operated an accredited proprietary business college. Ms. Scott, a Florida native, was a student at St. Petersburg Junior College in that State. Ms. Scott was 19, and Ms. Horstmeier was 48, when they met. Ms. Horstmeier and Ms. Scott's relationship developed, and in December 1973 or January 1974, they decided to live together. In March 1974, Ms. Scott left Florida and moved to Illinois with the intention of attending the University of Illinois and living with Ms. Horstmeier.

Upon arriving in Illinois, Ms. Scott moved in with a niece of Ms. Horstmeier. Shortly thereafter, Ms. Scott and Ms.

Horstmeier decided to look for a condominium to move into together. In March or April 1974, Ms. Horstmeier purchased a condominium in Skokie, Illinois, and began living there with Ms. Scott. Ms. Scott did virtually all of the housework and kept track of finances and bill paying for the couple. The women lived in the condominium until February 1975, when it was sold.

Thereafter, they moved into a house in Glenview, Illinois (the Glenview house). The Glenview house was purchased on January 31, 1975, for $105,000. All documents with respect to the Glenview house show that Ms. Horstmeier purchased the property in her name only. Ms. Horstmeier paid for the Glenview house with a $50,000 downpayment from her assets and a $55,000 mortgage for which she alone was liable. Ms. Horstmeier deducted 100 percent of the mortgage interest and real estate taxes with respect to the Glenview house on the tax returns she filed from 1975 through 1992.

At the time the Glenview house was purchased, Ms. Scott did not have assets to contribute to the purchase price, nor did she have a regular source of income. Ms. Horstmeier was receiving an annual salary from the business college of approximately $90,000. Ms. Scott did virtually all the housework and continued to manage household finances for the couple. She also performed all required maintenance. Maintenance work for the house was more extensive than that required for a condominium, and because Ms.

Horstmeier had substantial responsibilities as co-owner and operator of the business college, which left her less time for such duties, Ms. Scott assumed them. In addition to providing the services associated with maintaining the Glenview house, Ms. Scott also assisted Ms. Horstmeier with her work at the business college without compensation during their first 4 years residing together.

Ms. Scott was a student and not gainfully employed from 1974 through sometime in 1977. Her parents paid her tuition. She received money for her support during this period from her parents and from Ms. Horstmeier. In 1975, Ms. Scott purchased a Porsche 914 automobile, which required monthly payments of $140, as well as maintenance.

Sometime in 1977, Ms. Scott began to work at a Wendy's franchise and received compensation of an unspecified amount. She filed her first Federal income tax return with respect to the 1977 tax year.

In January of 1979, Ms. Scott began to receive compensation for her work at the business college. She began receiving an hourly wage and eventually received $200 per week.

In the spring of 1979, Ms. Scott and Ms. Horstmeier bought a 20-acre parcel of real property in Wisconsin. They each contributed to the downpayment of approximately $4,000, and the property was originally titled in both their names. Ms. Scott

made all of the 36 monthly mortgage payments, and after the payments were completed, they decided to title the property solely in Ms. Scott's name.

The records of Ms. Scott's personal checking account from April 1974 through May 1991, which was her only checking account during the period, indicate the only checks she wrote for household expenses before 1979 were modest and sporadic.[2] Beginning in 1979, she wrote monthly checks generally exceeding $100 for electric bills. Beginning in late 1985, she regularly wrote substantial checks to Ms. Horstmeier which were recorded as for "bills".

By the late 1980's, the business college was experiencing financial difficulties. From 1988 through 1992, Ms. Horstmeier periodically lent money to the college. As of March 1992, the outstanding balance on these loans was $165,325. To fund these loans, Ms. Horstmeier used proceeds from a home equity credit line, secured by a second mortgage in the Glenview house. Ms. Scott was opposed to the use of the home equity loan proceeds for the business college.

Ms. Horstmeier was diagnosed with pancreatic cancer in March 1992 and was advised by her doctors that her condition was probably terminal. In May 1992, using the proceeds from her

---

[2] There was one check written to Ms. Horstmeier for "mortgage" in 1974, before the purchase of the Glenview house.

pension at the business college, she paid off the home equity loan secured by the Glenview house.

Ms. Horstmeier died on January 25, 1993. In her will, the Glenview house is not mentioned specifically; it passed to Ms. Scott as the residuary beneficiary of a trust to which Ms. Horstmeier bequeathed her assets not required for estate administration. Ms. Scott was appointed executor of the estate. In August 1993, Ms. Scott filed a claim in the Circuit Court of Cook County, Illinois, County Department, Probate Division. The claim sought a 50-percent tenancy-in-common interest in the Glenview house. The claim stated, inter alia, as follows:

> a) that the decedent [i.e., Ms. Horstmeier] and claimant [i.e., Ms. Scott] would share the expenses regarding residence, including, but not limited to, mortgage, real estate taxes, capital improvements, day to day maintenance, and any other improvements agreed to be made by the parties.
>
> b) that the decedent would require the claimant to pay $3,000 of $25,000, which represented ½ of the downpayment made on the purchase of the home, per year, commencing in the year 1976.
>
> 3. That in fact the decedent and claimant have shared the expenses as agreed * * *, and also decedent, each year a $3,000 payment was required, required no payment and made a gift in the amount of $3,000 to * * * [claimant].

The probate court approved the claim. In doing so, the court did not pass upon the merits or the underlying facts of the claim, and no person with an adverse interest to Ms. Scott's contested or consented to the claim.

In August 1993, the Glenview house was sold for $459,000. On September 10, 1993, Ms. Scott filed the Federal estate tax return for the estate. On the estate tax return, Ms. Scott included 50 percent of the value of the Glenview house ($229,500) in the gross estate and deducted 50 percent of the remaining mortgage note balance ($14,500). In the notice of deficiency, respondent determined that 100 percent of the value of the Glenview house should have been included in the gross estate ($459,000) less selling expenses, and that 100 percent of the remaining mortgage note balance ($29,000) should have been deducted.

## Discussion

In order to establish that Ms. Horstmeier owned only 50 percent of the Glenview house at the time of her death, petitioner argues that a resulting trust with respect to one-half of the property arose in favor of Ms. Scott at the time the house was purchased. Thus, petitioner argues, under Illinois law Ms. Scott held the beneficial interest in one-half of the Glenview house and Ms. Horstmeier held only bare legal title with respect to that half. Respondent argues that petitioner has failed to prove the facts necessary to establish the existence of a resulting trust. We agree with respondent.

To decide whether a resulting trust arose, we apply the law of the State of Illinois. "[W]hat constitutes an interest in

property held by a person within a State is a matter of State law." Estate of Young v. Commissioner, 110 T.C. 297, 300 (1998) (citing Fernandez v. Wiener, 326 U.S. 340, 355-357 (1945)). The issue in this case is a factual one. The parties frame the question as being whether petitioner has proven that Ms. Scott satisfied the factual requirements of a resulting trust.[3] If so, a resulting trust arose in her favor, and only one-half the value of the Glenview house is includable in the taxable estate.

A resulting trust arises when one person furnishes consideration for property and title is taken in the name of another person. See Fowley v. Braden, 122 N.E.2d 559, 563 (Ill. 1954). A resulting trust does not depend on contract or agreement but arises by operation of law to enforce the presumed intent of the person who furnishes consideration for the property. See Prassa v. Corcoran, 181 N.E.2d 138, 140 (Ill.

---

[3] We are aware that the Supreme Court of Illinois has, under certain circumstances, refused to enforce equitable property rights between unmarried cohabitants on grounds of public policy. See Hewitt v. Hewitt, 394 N.E.2d 1204 (Ill. 1979). We are also aware that the Illinois Appellate Court has interpreted Hewitt to permit the enforcement of equitable property rights between unmarried cohabitants in some circumstances. See Spafford v. Coats, 455 N.E.2d 241 (Ill. App. Ct. 1983). But see Ayala v. Fox, 564 N.E.2d 920 (Ill. App. Ct. 1990). However, in the instant case, respondent has not raised the issue of whether a resulting trust should be disallowed under Illinois law on grounds of public policy. Because petitioner had no occasion to present pertinent evidence or argument on this question, we do not consider it and address only the question of whether the factual requirements for a resulting trust have been satisfied.

1962); Kane v. Johnson, 73 N.E.2d 321, 324 (Ill. 1947).  Unless there is evidence that a gift was intended from the payor to the person taking title, it is assumed that the payor intended to keep the beneficial interests of the property for which he or she paid.  See Prassa v. Corcoran, supra.  The fact that the payor borrowed from the person who took title does not prevent a resulting trust from arising.  See Towle v. Wadsworth, 35 N.E. 73 (Ill. 1893).  Nor does the fact that the agreement with respect to the loan and purchase of the property was oral rather than written.  See id.  Parol evidence may be used to prove a resulting trust.  See Ill. Rev. Stat. ch. 59, sec. 9 (1975) (now 740 Ill. Comp. Stat. 80/9 (West 1993)); Kohlhaas v. Smith, 97 N.E.2d 774, 776 (Ill. 1951).  A resulting trust arises at the instant title is taken, or not at all.  See Prassa v. Corcoran, supra.

The burden of proof is on the party seeking to establish a resulting trust, and, because recorded legal title is being rebutted, the standard of proof is "clear, convincing and unmistakable."  In re Estate of Wilson, 410 N.E.2d 23, 27 (Ill. 1980).  A resulting trust will not be sustained where the "evidence is doubtful or capable of reasonable explanation upon any theory other than the existence of a trust".  Kohlhaas v. Smith, supra at 776.

Petitioner has offered the claim filed by Ms. Scott and the decision of the Probate Division of the Circuit Court approving

the claim.  However, the Tax Court "is <u>not</u> conclusively bound by a State trial court adjudication of property rights or characterization of property interests when the United States is not a party to the proceeding."  <u>Estate of Rowan v. Commissioner</u>, 54 T.C. 633, 637 (1970) (citing <u>Commissioner v. Estate of Bosch</u>, 387 U.S. 456 (1967)).  Rather, we are to give the decision of the court "proper regard".  <u>Commissioner v. Estate of Bosch</u>, <u>supra</u> at 465.  As the parties have stipulated that the Probate Division of the Circuit Court "did not pass upon the merits or the underlying facts of * * * [Ms. Scott's] claim" in approving it, we give little weight to that decision.

Intent is critical in establishing a resulting trust.  See <u>In re Estate of Wilson</u>, <u>supra</u> at 27.  Although the requisite intent that the nominal owner is to hold legal title as trustee for the supplier of consideration must exist when title is taken, subsequent conduct of the parties is relevant to the extent it sheds light upon their intent.  See <u>Prassa v. Corcoran</u>, <u>supra</u> at 142.  Thus, we consider all of the facts and circumstances, including subsequent conduct, to determine whether petitioner has shown by clear and convincing evidence an intent that Ms. Horstmeier hold legal title to one-half of the Glenview house in trust for Ms. Scott.

Petitioner alleges that Ms. Scott and Ms. Horstmeier agreed to purchase the Glenview house jointly in equal shares.

According to petitioner, although Ms. Horstmeier supplied the downpayment and assumed the mortgage with respect to the purchase of the house, Ms. Horstmeier and Ms. Scott agreed at the time of purchase that Ms. Scott would repay her half of the downpayment, and supply one-half of the monthly mortgage payments and taxes, by providing all services required for the upkeep of the house. However, legal title was placed solely in Ms. Horstmeier's name because, petitioner contends, as an administrator of a business college, Ms. Horstmeier did not want questions raised regarding the nature of her relationship with Ms. Scott, given its same-sex character and their substantial age difference.

In order to establish a resulting trust, petitioner must prove by clear and convincing evidence that Ms. Scott provided consideration for a one-half interest in the Glenview house at the time of purchase. See American Natl. Bank & Trust Co. v. United States, 832 F.2d 1032, 1035-1036 (7th Cir. 1987); Hanley v. Hanley, 152 N.E.2d 879 (Ill. 1958). To prove consideration, petitioner alleges there was an agreement between Ms. Scott and Ms. Horstmeier under which Ms. Horstmeier would in effect lend the consideration for purchase of a one-half interest to Ms. Scott, with repayment to be made by Ms. Scott through future services. In Towle v. Wadsworth, supra, the court found that an oral agreement between Towle and Wadsworth, under which Towle was to purchase and take title to property but treat half of the

consideration paid as an advance to Wadsworth, was sufficient to establish a resulting trust in Wadsworth's favor for one-half of the property.  Thus, if petitioner establishes the existence of an agreement between Ms. Scott and Ms. Horstmeier covering Ms. Scott's consideration for the Glenview house purchase, it will be sufficient for us to find a resulting trust in Ms. Scott's favor.

Ms. Scott testified that she and Ms. Horstmeier had an agreement at the time of purchase that she could purchase one-half of the property by providing future services equal in value to the downpayment (at the rate of $3,000 per year plus interest) and the monthly payments.  Various witnesses who knew the couple, including Ms. Scott's mother, testified that it was their understanding that the two shared everything equally; however, none of these corroborating witnesses could testify regarding the specifics of the Glenview house purchase.  According to Ms. Scott's own testimony, however, Ms. Horstmeier "wasn't concerned at all" whether Ms. Scott contributed sufficient services, which casts some doubt on whether there was a "meeting of the minds" between the two of them that Ms. Horstmeier had lent to Ms. Scott one-half of the consideration for purchasing the house, with an expectation of repayment.

Ms. Scott testified that she would not have entered into the living arrangement with Ms. Horstmeier without an understanding that she would contribute her fair share.  Her testimony that she

did all the housework and house maintenance, as well as keeping track of the couple's finances, was corroborated by several witnesses.  However, at the time the Glenview house was purchased and for over 2 years thereafter, Ms. Scott was a student and did not have gainful employment.  She testified that her parents paid her tuition and that she received money from them and from Ms. Horstmeier.  The record does not establish what proportions came from each.

Ms. Scott's purported obligation to repay one-half of the downpayment, or $25,000, in annual increments of $3,000 plus interest, would approximate $250 to $300 per month.  The monthly mortgage payment on the Glenview house, which included taxes, was $675, half of which was $337.50.  Thus, before accounting for any other housing costs, such as utilities and out-of-pocket maintenance, Ms. Scott's testimony would indicate that she had assumed obligations approximating $600 per month.

In 1975, within a year of the house purchase and while still unemployed, Ms. Scott purchased a Porsche, obligating herself to monthly payments of $140.  The record demonstrates that Ms. Scott's living expenses were being paid from 1975 until sometime in 1977 at least in part by Ms. Horstmeier.  There is no record of any cash contribution toward household expenses by Ms. Scott until 1979.  The record provides some support for substantial contributions beginning in 1985--i.e., checks to Ms. Horstmeier

for "bills"--but this is too late to have much bearing on the parties' intent at the time of purchase.

The Court accepts Ms. Scott's testimony, which is corroborated, that she provided all of the services required to maintain the household, including significant maintenance work. Obviously, these services were valuable and benefited Ms. Horstmeier. Nonetheless, because Ms. Horstmeier was providing Ms. Scott with money for her living expenses, we believe the facts in this record are susceptible of another reasonable explanation; namely, that Ms. Scott's services in the 1970's were repayment for her living expenses, including rent. Ms. Scott has not shown that the value of her services so exceeded both the money being given her by Ms. Horstmeier and a fair market rent that the services must have been repayment for a half interest in the Glenview house. It is not unreasonable to interpret the services as reimbursement for living expenses and rent, rather than repayment of half the acquisition costs for the property. Certainly this interpretation is consistent with Ms. Horstmeier's retention of legal title for nearly 20 years while relinquishing it in other circumstances; i.e., with respect to the Wisconsin property. It is also consistent with Ms. Scott's contention that she would not have agreed to live with Ms. Horstmeier without paying her fair share.

Also problematic for Ms. Scott's characterization of the arrangement regarding the Glenview house are certain subsequent events. In 1979, approximately 4 years after the Glenview house was purchased, Ms. Scott and Ms. Horstmeier purchased land in Wisconsin. The property was titled jointly in both names. This casts some doubt on the rationale offered for avoiding a joint title for the Glenview house, although concededly Ms. Horstmeier may have been less concerned about appearances in another State. In addition, according to her testimony, because Ms. Scott made all of the payments on the Wisconsin property, Ms. Horstmeier suggested when all payments had been made that the title be placed solely in Ms. Scott's name. This was done. This episode at least suggests that Ms. Horstmeier and Ms. Scott were prepared in some circumstances to adjust the legal title to property to reflect their perceptions of the underlying equities of ownership.

Much later, starting in the late 1980's, Ms. Horstmeier took out a second mortgage on the Glenview house to secure a credit line and borrowed against it to provide funds to the business college she co-owned, which was experiencing financial difficulties. Ms. Scott testified that she was strongly opposed to the use of the house to secure debt to benefit the college. This exercise of exclusive control by Ms. Horstmeier casts some

doubt on whether both parties considered Ms. Scott a co-owner of the Glenview house.

Finally, the claim filed by Ms. Scott with the Probate Division of the Illinois Circuit Court states that Ms. Scott was to pay Ms. Horstmeier $25,000 for one-half of the downpayment on the Glenview house, at a rate of $3,000 per year starting in 1976, but that Ms. Horstmeier "made a gift in the amount of $3,000" for each year that payment was required. This representation to the probate court is in apparent conflict with Ms. Scott's testimony in this case, which was that she provided services in exchange for her half of the downpayment. In our view, this confusion regarding the downpayment is damaging to petitioner's case, given that the standard of proof for a resulting trust is "clear, convincing and unmistakable." In re Estate of Wilson, 410 N.E.2d at 27.

Considering all the facts and circumstances, we do not believe that petitioner has shown that a resulting trust arose under Illinois law, which requires clear and convincing evidence to support such a finding. Indeed, the Illinois Supreme Court has held that a resulting trust does not arise where the "evidence is doubtful or capable of reasonable explanation upon any theory other than the existence of a trust". Kohlhaas v. Smith, 97 N.E.2d at 776. The infirmities in petitioner's theory

--the confusion regarding the downpayment, Ms. Horstmeier's encumbrance of the house despite Ms. Scott's disapproval, the two women's willingness to take joint title to another property when each contributed to the downpayment--are cumulative and, considered together, cast doubt on the factual support for a resulting trust in this case.  As noted earlier, another reasonable explanation of the evidence is available.  It would appear that Ms. Scott's contribution of services and cash towards the Glenview house and the couple's mutual expenses may have grown over time, although the record remains unclear on this point.  In any event, these later actions have less probative value regarding the parties' intentions at the time title was taken in Ms. Horstmeier's name.  For the foregoing reasons, we conclude that Ms. Horstmeier's estate included the entire value of the Glenview house.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.