(No. 51264.—

VICTORIA L. HEWITT *et al.*, Appellees, v. ROBERT M.
HEWITT, Appellant.

*Opinion filed September 19, 1979.*

Marshall J. Auerbach, Michael J. Rovell, Joan B. Gottschall, Don R. Sampen, and Robert T. Markowski (Jenner & Block, of Chicago, and Robert I. Auler, of Urbana, of counsel), for appellant.

Burt Greaves, of Greaves, Lerner & Gadau, of Champaign, for appellee.

MR. JUSTICE UNDERWOOD delivered the opinion of the court:

The issue in this case is whether plaintiff Victoria Hewitt, whose complaint alleges she lived with defendant Robert Hewitt from 1960 to 1975 in an unmarried, family-like relationship to which three children have been born, may recover from him "an equal share of the profits and properties accumulated by the parties" during that period.

Plaintiff initially filed a complaint for divorce, but at a hearing on defendant's motion to dismiss, admitted that no marriage ceremony had taken place and that the parties have never obtained a marriage license. In dismissing that complaint the trial court found that neither a ceremonial nor a common law marriage existed; that since defendant

admitted the paternity of the minor children, plaintiff need not bring a separate action under the Paternity Act (Ill. Rev. Stat. 1975, ch. 106 3/4, par. 51 *et seq.*) to have the question of child support determined; and directed plaintiff to make her complaint more definite as to the nature of the property of which she was seeking division.

Plaintiff thereafter filed an amended complaint alleging the following bases for her claim: (1) that because defendant promised he would "share his life, his future, his earnings and his property" with her and all of defendant's property resulted from the parties' joint endeavors, plaintiff is entitled in equity to a one-half share; (2) that the conduct of the parties evinced an implied contract entitling plaintiff to one-half the property accumulated during their "family relationship"; (3) that because defendant fraudulently assured plaintiff she was his wife in order to secure her services, although he knew they were not legally married, defendant's property should be impressed with a trust for plaintiff's benefit; (4) that because plaintiff has relied to her detriment on defendant's promises and devoted her entire life to him, defendant has been unjustly enriched.

The factual background alleged or testified to is that in June 1960, when she and defendant were students at Grinnell College in Iowa, plaintiff became pregnant; that defendant thereafter told her that they were husband and wife and would live as such, no formal ceremony being necessary, and that he would "share his life, his future, his earnings and his property" with her; that the parties immediately announced to their respective parents that they were married and thereafter held themselves out as husband and wife; that in reliance on defendant's promises she devoted her efforts to his professional education and his establishment in the practice of pedodontia, obtaining financial assistance from her parents for this purpose; that she assisted defendant in his career with her own special

skills and although she was given payroll checks for these services she placed them in a common fund; that defendant, who was without funds at the time of the marriage, as a result of her efforts now earns over $80,000 a year and has accumulated large amounts of property, owned either jointly with her or separately; that she has given him every assistance a wife and mother could give, including social activities designed to enhance his social and professional reputation.

The amended complaint was also dismissed, the trial court finding that Illinois law and public policy require such claims to be based on a valid marriage. The appellate court reversed, stating that because the parties had outwardly lived a conventional married life, plaintiff's conduct had not "so affronted public policy that she should be denied any and all relief" (62 Ill. App. 3d 861, 869), and that plaintiff's complaint stated a cause of action on an express oral contract. We granted leave to appeal. Defendant apparently does not contest his obligation to support the children, and that question is not before us.

The appellate court, in reversing, gave considerable weight to the fact that the parties had held themselves out as husband and wife for over 15 years. The court noted that they had lived "a most conventional, respectable and ordinary family life" (62 Ill. App. 3d 861, 863) that did not openly flout accepted standards, the "single flaw" being the lack of a valid marriage. Indeed the appellate court went so far as to say that the parties had "lived within the legitimate boundaries of a marriage and family relationship of a most conventional sort" (62 Ill. App. 3d 861, 864), an assertion which that court cannot have intended to be taken literally. Noting that the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 101 *et seq.*) does not prohibit nonmarital cohabitation and that the Criminal Code of

1961 (Ill. Rev. Stat. 1977, ch. 38, par. 11—8(a)) makes fornication an offense only if the behavior is open and notorious, the appellate court concluded that plaintiff should not be denied relief on public policy grounds.

In finding that plaintiff's complaint stated a cause of action on an express oral contract, the appellate court adopted the reasoning of the California Supreme Court in the widely publicized case of *Marvin v. Marvin* (1976), 18 Cal. 3d 660, 557 P.2d 106, 134 Cal. Rptr. 815, quoting extensively therefrom. In *Marvin,* Michelle Triola and defendant Lee Marvin lived together for 7 years pursuant to an alleged oral agreement that while "the parties lived together they would combine their efforts and earnings and would share equally any and all property accumulated as a result of their efforts whether individual or combined." (18 Cal. 3d 660, 666, 557 P.2d 106, 110, 134 Cal. Rptr. 815, 819.) In her complaint she alleged that, in reliance on this agreement, she gave up her career as a singer to devote herself full time to defendant as "companion, homemaker, housekeeper and cook." (18 Cal. 3d 660, 666, 557 P.2d 106, 110, 134 Cal. Rptr. 815, 819.) In resolving her claim for one-half the property accumulated in defendant's name during that period the California court held that "The courts should enforce express contracts between nonmarital partners except to the extent that the contract is explicitly founded on the consideration of meretricious sexual services" and that "In the absence of an express contract, the courts should inquire into the conduct of the parties to determine whether that conduct demonstrates an implied contract, agreement of partnership or joint venture, or some other tacit understanding between the parties. The courts may also employ the doctrine of quantum meruit, or equitable remedies such as constructive or resulting trusts, when warranted by the facts of the case." (18 Cal. 3d 660, 665, 557 P.2d 106, 110, 134 Cal. Rptr. 815, 819.) The court

reached its conclusions because:

> "In summary, we believe that the prevalence of nonmarital relationships in modern society and the social acceptance of them, marks this as a time when our courts should by no means apply the doctrine of the unlawfulness of the so-called meretricious relationship to the instant case. \*\*\* \*\*\*
>
> The mores of the society have indeed changed so radically in regard to cohabitation that we cannot impose a standard based on alleged moral considerations that have apparently been so widely abandoned by so many." 18 Cal. 3d 660, 683-84, 557 P.2d 106, 122, 134 Cal. Rptr. 815, 831.

It is apparent that the *Marvin* court adopted a pure contract theory, under which, if the intent of the parties and the terms of their agreement are proved, the psuedo-conventional family relationship which impressed the appellate court here is irrelevant; recovery may be had unless the implicit sexual relationship is made the explicit consideration for the agreement. In contrast, the appellate court here, as we understand its opinion, would apply contract principles only in a setting where the relationship of the parties outwardly resembled that of a traditional family. It seems apparent that the plaintiff in *Marvin* would not have been entitled to recover in our appellate court because of the absence of that outwardly appearing conventional family relationship.

The issue of whether property rights accrue to unmarried cohabitants can not, however, be regarded realistically as merely a problem in the law of express contracts. Plaintiff argues that because her action is founded on an express contract, her recovery would in no way imply that unmarried cohabitants acquire property rights merely by cohabitation and subsequent separation.

However, the *Marvin* court expressly recognized and the appellate court here seems to agree that if common law principles of express contract govern express agreements between unmarried cohabitants, common law principles of implied contract, equitable relief and constructive trust must govern the parties' relations in the absence of such an agreement. (18 Cal. 3d 660, 678, 557 P.2d 106, 118, 134 Cal. Rptr. 815, 827; 62 Ill. App. 3d 861, 867-68.) In all probability the latter case will be much the more common, since it is unlikely that most couples who live together will enter into express agreements regulating their property rights. (Bruch, *Property Rights of De Facto Spouses, Including Thoughts on the Value of Homemakers' Services,* 10 Fam. L.Q. 101, 102 (1976).) The increasing incidence of nonmarital cohabitation referred to in *Marvin* and the variety of legal remedies therein sanctioned seem certain to result in substantial amounts of litigation, in which, whatever the allegations regarding an oral contract, the proof will necessarily involve details of the parties' living arrangements.

Apart, however, from the appellate court's reliance upon *Marvin* to reach what appears to us to be a significantly different result, we believe there is a more fundamental problem. We are aware, of course, of the increasing judicial attention given the individual claims of unmarried cohabitants to jointly accumulated property, and the fact that the majority of courts considering the question have recognized an equitable or contractual basis for implementing the reasonable expectations of the parties unless sexual services were the explicit consideration. (See cases collected in Annot., 31 A.L.R.2d 1255 (1953) and A.L.R.2d Later Case Service supplementing vols. 25 to 31.) The issue of unmarried cohabitants' mutual property rights, however, as we earlier noted, cannot appropriately be characterized solely in terms of contract law, nor is it limited to considerations of equity or fairness

as between the parties to such relationships. There are major public policy questions involved in determining whether, under what circumstances, and to what extent it is desirable to accord some type of legal status to claims arising from such relationships. Of substantially greater importance than the rights of the immediate parties is the impact of such recognition upon our society and the institution of marriage. Will the fact that legal rights closely resembling those arising from conventional marriages can be acquired by those who deliberately choose to enter into what have heretofore been commonly referred to as "illicit" or "meretricious" relationships encourage formation of such relationships and weaken marriage as the foundation of our family-based society? In the event of death shall the survivor have the status of a surviving spouse for purposes of inheritance, wrongful death actions, workmen's compensation, etc.? And still more importantly: what of the children born of such relationships? What are their support and inheritance rights and by what standards are custody questions resolved? What of the sociological and psychological effects upon them of that type of environment? Does not the recognition of legally enforceable property and custody rights emanating from nonmarital cohabitation in practical effect equate with the legalization of common law marriage—at least in the circumstances of this case? And, in summary, have the increasing numbers of unmarried cohabitants and changing mores of our society (Bruch, *Property Rights of De Facto Spouses Including Thoughts on the Value of Homemakers' Services,* 10 Fam. L.Q. 101, 102-03 (1976); Nielson, *In re Cary: A Judicial Recognition of Illicit Cohabitation,* 25 Hastings L.J. 1226 (1974)) reached the point at which the general welfare of the citizens of this State is best served by a return to something resembling the judicially created common law marriage our legislature outlawed in 1905?

Illinois' public policy regarding agreements such as the

one alleged here was implemented long ago in *Wallace v. Rappleye* (1882), 103 Ill. 229, 249, where this court said: "An agreement in consideration of future illicit cohabitation between the plaintiffs is void." This is the traditional rule, in force until recent years in all jurisdictions. (See, *e.g., Gauthier v. Laing* (1950), 96 N.H. 80, 70 A.2d 207; *Grant v. Butt* (1941), 198 S.C. 298, 17 S.E.2d 689.) Section 589 of the Restatement of Contracts (1932) states, "A bargain in whole or in part for or in consideration of illicit sexual intercourse or of a promise thereof is illegal." See also 6A Corbin, Contracts sec. 1476 (1962), and cases cited therein.

It is true, of course, that cohabitation by the parties may not prevent them from forming valid contracts about independent matters, for which it is said the sexual relations do not form part of the consideration. (Restatement of Contracts secs. 589, 597 (1932); 6A Corbin, Contracts sec. 1476 (1962).) Those courts which allow recovery generally have relied on this principle to reduce the scope of the rule of illegality. Thus, California courts long prior to *Marvin* held that an express agreement to pool earnings is supported by independent consideration and is not invalidated by cohabitation of the parties, the agreements being regarded as simultaneous but separate. (See, *e.g., Trutalli v Meraviglia* (1932), 215 Cal. 698, 12 P.2d 430; see also Annot., 31 A.L.R.2d 1255 (1953), and cases cited therein.) More recently, several courts have reasoned that the rendition of housekeeping and homemaking services such as plaintiff alleges here could be regarded as the consideration for a separate contract between the parties, severable from the illegal contract founded on sexual relations. (*Kozlowski v. Kozlowski* (1979), 80 N.J. 378, 403 A.2d 902; *Marvin v. Marvin* (1976), 18 Cal. 3d 660, 670 n.5, 557 P.2d 106, 113 n.5, 134 Cal. Rptr. 815, 822 n.5; *Tyranski v. Piggins* (1973), 44 Mich. App. 570, 205 N.W.2d 595, 597; contra, *Rehak v.*

*Mathis* (1977), 239 Ga. 541, 238 S.E.2d 81.) In *Latham v. Latham* (1976), 274 Or. 421, 547 P.2d 144, and *Carlson v. Olson* (Minn. 1977), 256 N.W.2d 249, on allegations similar to those in this case, the Minnesota Supreme Court adopted *Marvin* and the Oregon court expressly held that agreements in consideration of cohabitation were not void, stating:

> "We are not validating an agreement in which the only or primary consideration is sexual intercourse. The agreement here contemplated all the burdens and amenities of married life." 274 Or. 421, 427, 547 P.2d 144, 147.

The real thrust of plaintiff's argument here is that we should abandon the rule of illegality because of certain changes in societal norms and attitudes. It is urged that social mores have changed radically in recent years, rendering this principle of law archaic. It is said that because there are so many unmarried cohabitants today the courts must confer a legal status on such relationships. This, of course, is the rationale underlying some of the decisions and commentaries. (See, *e.g., Marvin v. Marvin* (1976), 18 Cal. 3d 660, 683, 557 P.2d 106, 122, 134 Cal. Rptr. 815, 831; *Beal v. Beal* (1978), 282 Or. 115, 577 P.2d 507; Kay & Amyx, *Marvin v. Marvin: Preserving the Options,* 65 Cal. L. Rev. 937 (1977).) If this is to be the result, however, it would seem more candid to acknowledge the return of varying forms of common law marriage than to continue displaying the naivete we believe involved in the assertion that there are involved in these relationships contracts separate and independent from the sexual activity, and the assumption that those contracts would have been entered into or would continue without that activity.

Even if we were to assume some modification of the rule of illegality is appropriate, we return to the fundamental question earlier alluded to: If resolution of this

issue rests ultimately on grounds of public policy, by what body should that policy be determined? *Marvin,* viewing the issue as governed solely by contract law, found judicial policy-making appropriate. Its decision was facilitated by California precedent and that State's no-fault divorce law. In our view, however, the situation alleged here was not the kind of arm's length bargain envisioned by traditional contract principles, but an intimate arrangement of a fundamentally different kind. The issue, realistically, is whether it is appropriate for this court to grant a legal status to a private arrangement substituting for the institution of marriage sanctioned by the State. The question whether change is needed in the law governing the rights of parties in this delicate area of marriage-like relationships involves evaluations of sociological data and alternatives we believe best suited to the superior investigative and fact-finding facilities of the legislative branch in the exercise of its traditional authority to declare public policy in the domestic relations field. (*Strukoff v. Strukoff* (1979), 76 Ill. 2d 53; *Siegall v. Solomon* (1960), 19 Ill. 2d 145.) That belief is reinforced by the fact that judicial recognition of mutual property rights between unmarried cohabitants would, in our opinion, clearly violate the policy of our recently enacted Illinois Marriage and Dissolution of Marriage Act. Although the Act does not specifically address the subject of nonmarital cohabitation, we think the legislative policy quite evident from the statutory scheme.

The Act provides:

> "This Act shall be liberally construed and applied to promote its underlying purposes, which are to:
>
> (1) provide adequate procedures for the solemnization and registration of marriage;
>
> (2) strengthen and preserve the integrity of marriage and safeguard family relationships." (Ill. Rev. Stat. 1977, ch. 40, par. 102.)

We cannot confidently say that judicial recognition of

property rights between unmarried cohabitants will not make that alternative to marriage more attractive by allowing the parties to engage in such relationships with greater security. As one commentator has noted, it may make this alternative especially attractive to persons who seek a property arrangement that the law does not permit to marital partners. (Comment, 90 Harv. L. Rev. 1708, 1713 (1977).) This court, for example, has held void agreements releasing husbands from their obligation to support their wives. (*Vock v. Vock* (1937), 365 Ill. 432; *VanKoten v. VanKoten* (1926), 323 Ill. 323; see also *Rhodes v. Rhodes* (1967), 82 Ill. App. 2d 435, 225 N.E.2d 802; Restatement of Contracts sec. 587 (1932); Weitzman, *Legal Regulation of Marriage: Tradition and Change,* 62 Cal. L. Rev. 1169, 1259-63 (1974).) In thus potentially enhancing the attractiveness of a private arrangement over marriage, we believe that the appellate court decision in this case contravenes the Act's policy of strengthening and preserving the integrity of marriage.

The Act also provides: "Common law marriages contracted in this State after June 30, 1905 are invalid." (Ill. Rev. Stat. 1977, ch. 40, par. 214.) The doctrine of common law marriage was a judicially sanctioned alternative to formal marriage designed to apply to cases like the one before us. In *Port v. Port* (1873), 70 Ill. 484, this court reasoned that because the statute governing marriage did not "prohibit or declare void a marriage not solemnized in accordance with its provisions, a marriage without observing the statutory regulations, if made according to the common law, will still be a valid marriage." (70 Ill. 484, 486.) This court held that if the parties declared their present intent to take each other as husband and wife and thereafter did so a valid common law marriage existed. (*Cartwright v. McGown* (1887), 121 Ill. 388, 398.) Such marriages were legislatively abolished in 1905, presumably because of the problems earlier noted, and the above-

quoted language expressly reaffirms that policy.

While the appellate court denied that its decision here served to rehabilitate the doctrine of common law marriage, we are not persuaded. Plaintiff's allegations disclose a relationship that clearly would have constituted a valid common law marriage in this State prior to 1905. The parties expressly manifested their present intent to be husband and wife; immediately thereafter they assumed the marital status; and for many years they consistently held themselves out to their relatives and the public at large as husband and wife. Revealingly, the appellate court relied on the fact that the parties were, to the public, husband and wife in determining that the parties living arrangement did not flout Illinois public policy. It is of course true, as plaintiff argues, that unlike a common law spouse she would not have full marital rights in that she could not, for example, claim her statutory one-third share of defendant's property on his death. The distinction appears unimpressive, however, if she can claim one-half of his property on a theory of express or implied contract.

Further, in enacting the Illinois Marriage and Dissolution of Marriage Act, our legislature considered and rejected the "no-fault" divorce concept that has been adopted in many other jurisdictions, including California. (See Uniform Marriage and Divorce Act secs. 302, 305.) Illinois appears to be one of three States retaining fault grounds for dissolution of marriage. (Ill. Rev. Stat. 1977, ch. 40, par. 401; Comment, *Hewitt v. Hewitt, Contract Cohabitation and Equitable Expectations Relief for Meretricious Spouses,* 12 J. Mar. J. Prac. & Proc. 435, 452-53 (1979).) Certainly a significantly stronger promarriage policy is manifest in that action, which appears to us to reaffirm the traditional doctrine that marriage is a civil contract between three parties—the husband, the wife and the State. (*Johnson v. Johnson* (1942), 381 Ill. 362;

*VanKoten v. VanKoten* (1926), 323 Ill. 323.) The policy of the Act gives the State a strong continuing interest in the institution of marriage and prevents the marriage relation from becoming in effect a private contract terminable at will. This seems to us another indication that public policy disfavors private contractual alternatives to marriage.

Lastly, in enacting the Illinois Marriage and Dissolution of Marriage Act, the legislature adopted for the first time the civil law concept of the putative spouse. The Act provides that an unmarried person may acquire the rights of a legal spouse only if he goes through a marriage ceremony and cohabits with another in the good-faith belief that he is validly married. When he learns that the marriage is not valid his status as a putative spouse terminates; common law marriages are expressly excluded. (Ill. Rev. Stat. 1977, ch. 40, par. 305.) The legislature thus extended legal recognition to a class of nonmarital relationships, but only to the extent of a party's good-faith belief in the existence of a valid marriage. Moreover, during the legislature's deliberations on the Act *Marvin* was decided and received wide publicity. (See Note, 12 J. Mar. J. Prac. & Proc. 435, 450 (1979).) These circumstances in our opinion constitute a recent and unmistakeable legislative judgment disfavoring the grant of mutual property rights to knowingly unmarried cohabitants. We have found no case in which recovery has been allowed in the face of a legislative declaration as recently and clearly enacted as ours. Even if we disagreed with the wisdom of that judgment, it is not for us to overturn or erode it. *Davis v. Commonwealth Edison Co.* (1975), 61 Ill. 2d 494, 496-97.

Actually, however, the legislative judgment is in accord with the history of common law marriage in this country. "Despite its judicial acceptance in many states, the doctrine of common-law marriage is generally frowned on in this country, even in some of the states that have

accepted it." (52 Am. Jur. 2d 902 *Marriage* sec. 46 (1970).) Its origins, early history and problems are detailed in *In re Estate of Soeder* (1966), 7 Ohio App. 2d 271, 220 N.E.2d 547, where that court noted that some 30 States did not authorize common law marriage. Judicial criticism has been widespread even in States recognizing the relationship. (See, *e.g., Baker v. Mitchell* (1941), 143 Pa. Super. 50, 54, 17 A.2d 738, 741, "a fruitful source of perjury and fraud ***"; *Sorensen v. Sorensen* (1904), 68 Neb. 500, 100 N.W. 930.) "It tends to weaken the public estimate of the sanctity of the marriage relation. It puts in doubt the certainty of the rights of inheritance. It opens the door to false pretenses of marriage and the imposition on estates of suppositious heirs." 7 Ohio App. 2d 271, 290, 220 N.E.2d 547, 561.

In our judgment the fault in the appellate court holding in this case is that its practical effect is the reinstatement of common law marriage, as we earlier indicated, for there is no doubt that the alleged facts would, if proved, establish such a marriage under our pre-1905 law. (*Cartwright v. McGown* (1887), 121 Ill. 388.) The concern of both the *Marvin* court and the appellate court on this score is manifest from the circumstance that both courts found it necessary to emphasize marital values ("the structure of society itself largely depends upon the institution of marriage" (*Marvin v. Marvin* (1976), 18 Cal. 3d 660, 684, 557 P.2d 106, 122, 134 Cal. Rptr. 815, 831) and to deny any intent to "derogate from" (18 Cal. 3d 660, 684, 557 P.2d 106, 122, 134 Cal. Rptr. 815, 831) or "denigrate" (*Hewitt v. Hewitt* (1978), 62 Ill. App. 3d 861, 868) that institution. Commentators have expressed greater concern: "[T]he effect of these cases is to reinstitute common-law marriage in California after it has been abolished by the legislature." (Clark, *The New Marriage,* Williamette L.J. 441, 449 (1976).) "[*Hewitt*] is, if not a direct resurrection of

common-law marriage contract principles, at least a large step in that direction." Reiland, *Hewitt v. Hewitt: Middle America, Marvin and Common-Law Marriage,* 60 Chi. B. Rec. 84, 88-90 (1978).

We do not intend to suggest that plaintiff's claims are totally devoid of merit. Rather, we believe that our statement in *Mogged v. Mogged* (1973), 55 Ill. 2d 221, 225, made in deciding whether to abolish a judicially created defense to divorce, is appropriate here:

"Whether or not the defense of recrimination should be abolished or modified in Illinois is a question involving complex public-policy considerations as to which compelling arguments may be made on both sides. For the reasons stated hereafter, we believe that these questions are appropriately within the province of the legislature, and that, if there is to be a change in the law of this State on this matter, it is for the legislature and not the courts to bring about that change."

We accordingly hold that plaintiff's claims are unenforceable for the reason that they contravene the public policy, implicit in the statutory scheme of the Illinois Marriage and Dissolution of Marriage Act, disfavoring the grant of mutually enforceable property rights to knowingly unmarried cohabitants. The judgment of the appellate court is reversed and the judgment of the circuit court of Champaign County is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*