**Laura LYNCH, Plaintiff,**

v.

**Otis BOWEN, Secretary of Health and Human Services, Defendant.**

**No. 85 C 7642.**

United States District Court, N.D. Illinois, E.D.

March 1, 1988.
As Amended April 1, 1988.

---

Barbara S. Shulman, Northwestern University Legal Clinic, Chicago, Ill., for plaintiff.

Anton R. Valukas, U.S. Atty., John S. Brennan, Asst. U.S. Atty., Donna Morros Weinstein, Chief Counsel, Donna L. Calvert, Asst. Regional Counsel, Dept. of Health and Human Services, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Laura Lynch ("Lynch") seeks widow's insurance benefits, based on the earnings record of James Lynch ("James"),[1] under part of the Old Age, Survivors and Disability Insurance program ("OASDI") embodied in Social Security Act ("Act") § 202(e), 42 U.S.C. § 402(e).[2] When Lynch sought judicial review of a final decision by the Secretary of Health and Human Services ("Secretary") denying her claim, this Court issued a July 1, 1986 order remanding the case to Secretary for further consideration.

After a December 16, 1986 hearing, Administrative Law Judge ("ALJ") Irving Stillerman denied Lynch's application on March 17, 1987. When the Appeals Council affirmed the ALJ's decision July 10, 1987, Lynch renewed this action against Secretary under Section 405(g).

Now the parties have filed cross-motions for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, Secretary's motion is granted and Lynch's is denied.

### Facts[3]

Lynch, now 65, lived with James as wife and husband from 1946 until James' death on January 30, 1984. Lynches were never married in a formal ceremony, but Lynch insists they believed they were married under common law principles they thought the State of Illinois recognized. Lynches were domiciled in Illinois for their entire time together.

Lynches had three children and maintained a series of apartments together in

---

1. Laura and James Lynch will collectively be referred to as "Lynches."

2. All further citations to provisions of the Act will take the form "Section—," referring to the Title 42 numbering rather than to the Act's internal numbering.

3. This factual discussion is largely taken from Lynch's submissions to the Court. As befits a summary judgment motion, the facts must be viewed in the light most favorable to the non-movant on the successful motion—in this case Lynch (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987)). Because this case turns solely on a question of law and the essential facts are not in dispute, no problem arises in this respect. However, this opinion's references to the record are limited as the result of an unfortunate misunderstanding as to the filing of documents in the Clerk's Office. Although government counsel properly filed the administrative record as it was developed following the July 1986 remand, that record did not find its way to the regular court file in the Clerk's Office. Accordingly, when this Court's law clerk began to prepare his draft opinion to submit for this Court's reworking and final preparation, he found no administrative record in the court file—and this opinion therefore had to be prepared solely on the basis of the parties' legal submissions. Given the nature of the dispute, however, that has had no impact whatever on the analysis or conclusions reached here.

Chicago. They introduced each other as husband and wife, signed various joint contracts and filed joint income tax returns. Lynch was also the beneficiary of James' life insurance policy.

During their time together Lynches took four trips outside the State of Illinois— trips now offered to establish a valid common law marriage. They took two trips to Pennsylvania, the first (in 1947) of about ten days' duration to visit Lynch's relatives and the second (in 1948) for about two or three days to investigate a possible business opportunity. Lynch also recalls a 1948 trip of three or four days' length to Atlanta, Georgia, where James had an engagement as a musician in a band. Lynches also travelled with one of their daughters to Washington, D.C. for one week in 1965. On all those trips Lynches travelled and held themselves out as husband and wife. When staying in hotels they registered as a married couple.

### History of Lynch's Claim

After James' death, Lynch applied for survivor's benefits under the Act on March 1, 1984. Her application was denied, originally and on reconsideration, on the basis that she was not James' widow under Illinois law. Lynch requested and obtained a hearing, held before ALJ James Drzewiecki on October 30, 1984. ALJ Drzewiecki's November 30, 1984 decision denied Lynch's application, finding (1) Lynches had lived solely in Illinois, (2) Illinois did not recognize common law marriages and (3) Lynch had not established a valid common law marriage in any other state (R. 5). On July 1, 1985 the Appeals Council declined to review the ALJ's decision, and Lynch initially sought judicial review here.

On Lynch's motion, this Court (as stated at the outset of this opinion) remanded the case for a determination whether Lynch had validly established her marriage under the laws of any sister state and the opera-

tive provisions of Illinois law for the recognition of foreign marriages. Lynch received her second hearing (that before ALJ Stillerman), then returned to this Court once Secretary's decision had become final.

### Applicable Standards

Of course one precondition to the payment of widow's insurance benefits under the Act is the claimant's proof she was married to the insured individual at the time of his death. Section 416(h)(1)(A) contains the relevant definition of marriage:

An applicant is the ... widow ... of a fully or currently insured individual for purposes of this subchapter if ... the courts of the State in which he was domiciled at the time of death ... would find that such applicant and such insured individual were validly married ... at the time he died.[4]

Under Illinois law (James was domiciled here at his death) common law marriages contracted in Illinois after 1905 are invalid (Ill.Rev.Stat. ch. 40, ¶ 214). But the Illinois Marriage and Dissolution of Marriage Act (the "Illinois Act," enacted in 1977) also contains a provision for the recognition of foreign marriages (Ill.Rev.Stat. ch. 40, ¶ 213):[5]

All marriages contracted ... outside this State, that were valid at the time of the contract or subsequently validated by the laws of the place in which they were contracted or by the domicile of the parties, are valid in this State, except where contrary to the public policy of this State.

### Secretary's Decision

ALJ Stillerman's March 17, 1987 decision focused on the legal question whether Illinois courts would recognize Lynches as married at the time of James' death. After reviewing Lynch's testimony and the documentary evidence she submitted, the ALJ found Lynches were domiciled only in Illi-

---

4. [Footnote by this Court] Section 416(h)(1)(A) also states an individual shall be deemed a widow, even without a valid marriage, if the individual would have the status of a widow for the devolution of intestate personal property. Lynch has not claimed that status.

5. All further references to the Illinois Act will take the form "Ill. Act § —." This use of the "§" symbol rather than "¶" conforms to the Illinois General Assembly's use of the former in the internal designation of legislation, while Smith–Hurd uses the latter in its statutory compilation.

nois during their relationship and Illinois would not recognize a common law marriage contracted here (ALJ decision at 4). ALJ Stillerman then considered whether Illinois would recognize a common law marriage Lynches may have contracted during their visits to jurisdictions that accept such marriages. Although some other states might do so, the ALJ concluded Illinois law would not recognize a foreign common law marriage contracted by its own domiciliaries (*id.* at 4–5).

ALJ Stillerman's decision concluded with the following findings (*id.* at 6):

4. The claimant and wage earner were, at all times during the years they lived together, domiciled in the State of Illinois, and the wage earner was domiciled in the State of Illinois at the time of his death.

5. The claimant and wage earner never went through a ceremonial marriage, valid or otherwise, were never domiciled in a state recognizing common-law marriage, were never validly married under Illinois law, and the claimant would not be found to be the widow or inherit as such by the courts of Illinois.

6. The claimant and wage earner could not and did not effectuate a validly contracted common-law marriage in any other jurisdiction or state.

7. The claimant is not the widow of the wage earner within the meaning of Section 216(h)(1)(A) of the Social Security Act.

Those and ALJ Stillerman's other findings and conclusions were adopted by the Appeals Council, so the decision became Secretary's.

### Lynch's Arguments

■ Lynch contends she and James established a valid common law marriage through their brief visits to the states of Pennsylvania and Georgia and the District of Columbia. Under the laws of each of those jurisdictions, a couple are married if they (1) have agreed with the present intent to form a marital relationship and (2) later hold themselves out in that state as married with any degree of cohabitation (see, e.g., *In re Estate of Gavula*, 490 Pa. 535, 540, 417 A.2d 168, 171 (1980)). Lynch says Illinois law, as codified in Ill. Act § 213, would recognize her foreign common law marriage.[6]

### Illinois' Recognition of Foreign Common Law Marriages

At the outset it is profitable to identify which aspects of this inquiry are not in dispute. First, Lynches were Illinois domiciliaries throughout their relationship (Lynch Mem. 1). Illinois law thus governs whether they were married. Second, Illinois does not recognize common law marriages between its citizens when contracted within this state (Ill. Act § 214).

This case therefore turns on the interpretation of Ill. Act § 213, which governs Illinois' recognition of marriages that occur outside its jurisdiction.[7] This opinion will

---

6. Lynch also alleged in her Amended Complaint before this Court that Secretary's denial of her benefits violated the Fifth Amendment's Equal Protection Clause (Amended Complaint ¶ 11). However, Lynch has not pursued that challenge and has not raised it as a defense to Secretary's summary judgment motion.

7. Secretary's memorandum to this Court also emphasizes Ill.Act § 216, but it is seriously flawed in its analysis. Its repeated refrain (Secretary Mem. 6 [in two places], 7, 8, 9) is that Lynches' claimed common law marriage was "null and void" because it ran afoul of Ill.Act § 216:

That if any person residing and intending to continue to reside in this state and who is disabled or prohibited from contracting marriage under the laws of this state, shall go into

another state or country and there contract a marriage prohibited and declared void by the laws of this state, such marriage shall be null and void for all purposes in this state with the same effect as though such prohibited marriage had been entered into in this state.

That argument of course misses the obvious point that there was nothing at all that "disabled or prohibited [Lynches] from contracting marriage under the laws of this state": They were not (say) first cousins, who could not validly marry here (Ill.Act § 212) and would have to travel elsewhere to escape the taint of illegality. Had Lynches appeared before a judge or other person authorized to solemnize marriages in Illinois, they were perfectly competent to have regularized their relationship as an Illinois-recognized marriage. Thus Ill.Act § 216 is simply inapplicable to Lynches' situation. It may be

assume arguendo that Lynches did establish a common law marriage under the law of one or more of Pennsylvania, Georgia and the District of Columbia by their visits.[8] Nonetheless this Court concludes Illinois law would not recognize such a common law marriage contracted by Illinois domiciliaries in a foreign jurisdiction.

When the Illinois General Assembly enacted the Illinois Act in 1977, it was not writing on a clean slate. Illinois had prior statutory codifications governing marriages (see the pre-1977 Ill.Rev.Stat. ch. 89, ¶¶ 1 ff.) and considerable common law on the subject. Smith-Hurd's Historical and Practice Notes published with Ill. Act § 213 indicate the section was not meant to be a break with the past (S.H.A. ch. 40, ¶ 213, at 62–63):

> This section, although new to Illinois statutory law, continues the prior common law of this State.

At least three pre-Illinois-Act cases considered whether Illinois would recognize foreign common law marriages of its own domiciliaries—and all those cases gave a negative answer to that question.

*Enoch* involved Illinois domiciliaries who had spent approximately two weeks in Colorado, a trip offered to prove the existence of a common law marriage (52 Ill.App.2d at 48–49, 201 N.E.2d at 687). *Enoch* held Illinois' prohibition on common law marriages would follow its citizens to another state and therefore rejected the claimed common law marriage in Colorado (*id.* at 52–53, 201 N.E.2d at 689). *In re Estate of Stahl*, 13 Ill.App.3d 680, 682–83, 301 N.E. 2d 82, 83–84 (1st Dist.1973) reached that

same result, refusing to recognize a Texas common law marriage by a couple domiciled in Illinois.

One earlier case (though its discussion of the issue was dictum) is of particular significance, for reasons discussed later in this opinion. *Peirce v. Peirce*, 379 Ill. 185, 39 N.E.2d 990 (1942) upheld a Nevada common law marriage because the parties were Nevada domiciliaries during their one month spent together in that state (*id.* at 190–93, 39 N.E.2d at 993).[9] In the course of its opinion, the Illinois Supreme Court distinguished the cases that later served as the underpinnings for *Enoch* and *Stahl* (*id.*):

> The rule [that a common law marriage is void in Illinois, even if performed in some other jurisdiction] is limited to the situation where the parties whose marriage is sought to be upheld in Illinois were, at the time of the marriage, domiciled in Illinois, although the marriage occurred in another state.

*Peirce, id.* (citations omitted) confirmed both that rule and the controlling principle "that the marital status is governed by the law of the State of domicile."

Lynch seeks to avoid the impact of all that earlier case law by arguing that Ill. Act § 213 incorporates a broader policy for the recognition of foreign marriages, including common law marriages. But what that section says is that all foreign marriages valid where executed will be valid in Illinois *except* where such recognition is "contrary to the public policy of this State." Thus the issue hinges on whether

---

that its statutory provision manifests the same kind of legislative attitude toward Illinois domiciliaries as the judicial attitude reflected in the case law discussed later in the text—a public policy against any change in Illinoisans' marital status by other jurisdictions if Illinois would not work the same change under the same circumstances. But Secretary is simply wrong in viewing Ill.Act § 216 as dispositive (or even applicable).

8. Secretary Mem. 6 n. 3 does not altogether concede that a brief sojourn suffices to establish a common law marriage in those jurisdictions. This opinion need not reach that issue, because resolution of the case rests on Illinois' refusal to accept such a marriage in any event. However,

it is worth noting that while some states require more than a brief visit to establish a common law marriage there (see *In re Estate of Enoch*, 52 Ill.App.2d 39, 53–54, 201 N.E.2d 682, 689–90 (1st Dist.1964) (discussing Colorado law)), other states—including one at issue here—would find a common law marriage based on such limited contacts (see, e.g., *Renshaw v. Heckler*, 787 F.2d 50, 53 (2d Cir.1986), holding New York would recognize a Pennsylvania common law marriage from periodic visits).

9. In *Peirce, id.* the couple's *Illinois* sojourn was a temporary one ("No intention to make Illinois their residence appears from the record").

the purported marriage in this case violates Illinois public policy.[10]

Lynch relies heavily on a statement in the Historical and Practice Notes to Ill. Act § 213:

> The public policy exception does not, however, apply to common law marriages.

But as the Appeals Council Decision at 2 pointed out, that statement must be taken in the larger context of the Historical and Practice Notes, which go on to say:

> Although common law marriages which are validly contracted in other states are considered contrary to Illinois public policy such marriages are recognized as valid in Illinois, unless contracted in evasion of Illinois law. *Peirce v. Peirce*, 379 Ill. 185, 39 N.E.2d 990 (1942); *Acklin v. Employees Benefit Ass'n*, 222 Ill.App. 369 (4th Dist.1920). This does not alter the rule that common law marriages contracted in Illinois after June 30, 1905, are invalid. § 214. See *Hewitt v. Hewitt*, 77 Ill.2d 49, 394 N.E.2d 1204, 31 Ill.Dec. 827 (1979).

As the Appeals Council then noted (Decision at 3), the Notes' citation of *Peirce* in that context is significant. It plainly indicates the "marriages recognized as valid in Illinois" because "validly contracted in other states" are those foreign common law marriages contracted by *non-Illinois* domiciliaries. Despite Illinois' policy against such marriages, they will be recognized when couples later move to Illinois.[11] But the *Peirce*-confirmed policy against such marriages by *Illinois* domiciliaries cannot fairly be viewed as having been questioned—let alone changed—by the Notes.

Lynch makes a valiant effort to rebut that conclusion—but an effort lacking precedential support. Lynch R. Mem. 6 argues that Illinois' refusal to recognize foreign common law marriages contracted "in evasion of Illinois law" is intended to cover only "Illinois couples [who] were aware of Illinois law and *intended* to evade it in contracting a foreign marriage" (emphasis in original). Lynch says she and James were unaware that Illinois did not accept common law marriages and did not make their out-of-state trips with the intent of evading Illinois' prohibition.

That offered distinction finds no support in the case law. There is no indication Illinois courts would accept such a "pure heart" defense to the invalidation of such foreign marriages. True enough, the facts of cases such as *Stahl* and *Enoch* suggest the parties may have been aware of the Illinois ban on common law marriages. However, the discussion in those cases wholly ignores that element of the parties' intent. In fact, *Stahl* specified the narrow inquiry required to determine the validity of a foreign common law marriage (13 Ill. App.3d at 682, 301 N.E.2d at 83, after citing and quoting *Peirce* to the identical effect):

> Thus, we need only focus on the single issue of the domicile of the parties.

*Peirce* indeed focused solely on the parties' domicile, ignoring any issue of intent to violate Illinois law (379 Ill. at 190–93, 39 N.E.2d at 993). Although the *Peirce* discussion of the grounds for invalidating foreign common law marriages could be considered dictum, it has been generally recognized as authority for the limitation on the recognition of foreign marriages (see, e.g.,

**10.** Lynch R.Mem. 5 places great emphasis on the notes of the Commissioners on Uniform Laws to Section 210 of the Uniform Marriage and Divorce Act, on which Ill. Act § 213 was based. That analogy is of limited use, however, and may even cut the other way. Illinois' express public policy exception to the recognition of foreign marriages is not contained in the Uniform Act. It is familiar doctrine (and common sense) that such substantial changes in language from a uniform law carry with them intended changes in meaning. Because the legislature has mandated that Illinois public policy will specifically override the full-faith-and-credit

approach of Uniform Act § 210, the commentaries on the latter cannot carry the day against evidence of a contrary Illinois public policy.

**11.** As for the two other cases cited in the quoted excerpt from the Notes, *Acklin* involved the validity in Illinois of a common law marriage contracted by Missouri residents in Missouri (222 Ill.App. at 373), while *Hewitt* concerned property rights potentially acquired between unmarried cohabitants (and is discussed later in the text of this opinion).

26 I.L.P. *Marriages* § 5, at 211 & nn. 26–27).

Obvious difficulties would be created by Lynch's interpretation of Ill. Act § 213. Those problems would go beyond simply the encouragement of "forum shopping" acknowledged by Lynch R. Mem. 6. Courts interpreting Illinois law would have the daunting task of divining the intent and knowledge of those seeking to establish a common law marriage based on a "brief sojourn" theory. Such inquiries (almost invariably made long after the fact, and often with one of the "marital" partners already dead) would encourage self-serving statements of innocence and ignorance—with no objective means of either confirmation or impeachment. It is no accident that the fear of perjury played a significant part in leading the majority of states to prohibit common law marriages in the first place (see 52 Am.Jur.2d *Marriage* § 46 ("a fruitful source of perjury and fraud—to be tolerated and not encouraged")). Requiring such judicial inquiries would certainly undermine the stability and predictability of the property and personal relationships involved in marriages.

Secretary is also correct that the establishment of marriages by mere visits to appropriate jurisdictions could significantly erode Illinois' prohibition on common law marriages. Validity of those marriages would turn on the happenstance of which state a couple chooses to visit (however briefly). Illinois' continuing policy against establishing a legal marriage relationship without the required formalities was reconfirmed not only by the passage of the Illinois Act but by the post-Act decision in *Hewitt* rejecting mutual property rights between unmarried cohabitants. *Hewitt*'s denial of the plaintiff's claim was based in part on the fear that recognition of the claim would have the practical effect of reinstating common law marriage, a prospect that had been clearly rejected by the General Assembly in adopting the Illinois Act (77 Ill.2d at 61–66, 394 N.E.2d at 1209–11, 31 Ill.Dec. at 832).

In sum, this Court must agree with Secretary that Illinois would not recognize the existence of a common law marriage based on brief stays by Illinois domiciliaries in a state that permits such marriages. Secretary is thus correct in finding Lynch was not James' widow for purposes of entitlement to OASDI benefits.

### Conclusion

This Court's role is limited to determining whether Secretary's reading of Illinois law was correct. On that score the Illinois General Assembly and courts have spoken with a clear voice, deciding that (1) common law marriages cannot be established in Illinois and (2) the State will not recognize such marriages contracted elsewhere by its own citizens. It is not for this Court to question whether the course pursued by Illinois law is the correct one in a policy sense or whether Congress is correct to defer to that policy for the eligibility determination for Social Security benefits in this case. Under the law as it stands, Lynch is not eligible for widow's insurance benefits.

There is no genuine issue of material fact (in the outcome-determinative sense), and Secretary is entitled to a judgment as a matter of law. Lynch's motion for summary judgment is denied, and Secretary's motion for summary judgment is granted. This action is dismissed.