## CIRCUIT COURT OF ROCKINGHAM COUNTY

Gretchen Anne Hazard Reynolds

v.

Charles Wilson Reynolds, Jr.

June 4, 2003

Case No. CH00-17823

BY JUDGE JOHN J. MCGRATH, JR.

The complex procedural history of this divorce litigation is set forth in this Court's earlier opinion in *Reynolds v. Reynolds*, 60 Va. Cir. 414 (2002). The *ore tenus* hearing has been concluded, and the issues remaining for decision are:

(1) Did Plaintiff and Defendant form a common law marriage?

(2) If so, what is the date of their final separation for the purpose of dividing the marital property?

(3) If there was a valid common law marriage, how should the marital property be divided, and what, if any, spousal support should be awarded to the Plaintiff?

The essential facts of this case are that the Plaintiff and Defendant met when Defendant was a teaching assistant at the University of Texas at Austin and Plaintiff was one of his graduate students. At the time they started dating in late 1976 or early 1977, the Defendant was married with a young child. In early 1978, Defendant divorced his wife, and Plaintiff began living together with him in the summer of 1978.

The parties, who described themselves as deeply committed "hippies" at this time, had, to say the least, a tempestuous relationship. In June of 1978, they were living together in a flat on Annie Street in Austin. In August of 1978, Defendant moved out of Annie Street and obtained his own apartment

on West 34th Street in Austin, which was about ten to fifteen miles from the Annie Street apartment. At that time, Plaintiff had a female friend move in with her and began to share the rent of the flat.

As of August 1978, Plaintiff and Defendant were not living together, but they continued to have sex about every other week. During this time, the Defendant's post-doctoral grant at the University of Texas was running out, and he was looking for full-time employment outside the State of Texas. According to the Defendant, he did not intend to take Plaintiff with him when he left Texas. However, in early December of 1978, Plaintiff informed Defendant that she was pregnant with his child.

Both parties agree that, because of the baby, they wanted to commit ethically and spiritually to each other. However, neither wanted to be married because (a) the Defendant had previously been married and did not want to ever marry again, and (b) both Plaintiff and Defendant were anarchists or semi-anarchists and did not believe the Government had the authority to grant or deny marriage licenses and/or "legalize" interpersonal commitments.

Sometime in late February or early March of 1979, the Plaintiff sent out hand-written invitations for a "ceremony" which would take place at the Pecan Street Cafe in Austin on March 10, 1979. On the appointed day, the Plaintiff and Defendant had dinner with ten of their friends at a table in the corner of the Pecan Street Cafe. Other diners were present at other tables and were not part of the celebration. The Defendant characterizes this as a "going away party" that they had for a few friends because he had accepted a job with Bell Labs in Illinois. However, various correspondence received from friends and relatives (Plaintiff's Exhibit No. 1) indicates that at least the Plaintiff had envisioned the dinner as some type of "Joining Ceremony" during which the couple would express an ethical commitment to be there for each other and their soon to be born child and through which they would be "spiritually bound."

Shortly after the event at the Pecan Street Cafe, Plaintiff and Defendant went for a trip to a motel in Galveston, Texas. Plaintiff characterizes this as a "honeymoon," while Defendant claims that this was simply a get away over their spring break. When they returned to Austin in March of 1979, the Plaintiff and Defendant appear to have maintained separate apartments about ten to fifteen miles apart, but they slept together on a number of evenings in March, April, and May of 1979.

As can be imagined, the evidence of the Plaintiff and Defendant was in great conflict on what the intent of the "joining ceremony/going away party"

was and whether the parties held themselves out as being married while in Texas. Even the Plaintiff seems to agree that there was no intent to form any type of "union" or "ethical commitment" until the affair at the Pecan Street Cafe. Prior to that, both parties seem to agree that they were "hippies" who were simply "living together" from time to time. The parties moved from Texas to Illinois in May of 1979. Therefore, the Texas common law marriage, if there is one, would have to have been formed in the six to eight weeks that the parties were in Texas between the Pecan Street Cafe ceremony and the move to Illinois.

The Plaintiff concedes that she never asked the Defendant to "marry" her, but testified that after the ceremony she told fellow workers and friends in Texas that she was "married." Plaintiff, however states that she did not use the last name of "Reynolds" while in Texas, but first adopted that last name in April of 1979, when signing a lease in Illinois and then when the parties returned to Illinois on a permanent basis in May of 1979. Plaintiff apparently never used "Reynolds" as a surname in Texas. Defendant testified that the whole agreement that they had was for a non-marriage, because neither of them believed in marriage and they had not wanted to fall into a legally confining arrangement. Defendant says that, while in Texas, he never told anyone he was married and never referred to Plaintiff as his wife. He admits that all of this changed when they moved to Wheaton, Illinois, and joined the straight-laced and button-down world of Bell Labs.

In April of 1979, Plaintiff and Defendant took a week trip to Illinois to make final arrangements for Defendant to move into his new job. They introduced themselves to Bell Labs personnel as husband and wife; applied to rent an apartment as husband and wife; and completed the payroll and other personnel forms at Bell Labs as husband and wife. After completing this preparatory trip, Plaintiff and Defendant went back to Texas. They apparently cohabited at various times at Plaintiff's apartment and Defendant's apartment; however, they each maintained a separate residence for the rest of their time in Texas. In May of 1979, Plaintiff and Defendant moved out of Texas and never returned.

Once in Illinois (where they lived for about 1½ years), Plaintiff and Defendant held themselves out to the world as husband and wife. They signed contracts, filed joint tax returns as husband and wife, and Defendant claimed Plaintiff on all of his employment related benefits as his "wife."

In December of 1980, Plaintiff and Defendant moved to Virginia, where Defendant took a position as a Professor at James Madison University. There

is no question that upon their arrival in Virginia, Plaintiff and Defendant represented to everyone that they were husband and wife. Not only did they file joint tax returns, but Plaintiff was listed as Defendant's wife on all of Defendant's employment related paperwork with James Madison University, the Commonwealth of Virginia, and the Virginia Retirement System (VRS). Similarly, they purchased property as husband and wife as tenants by the entirety, and they filed joint federal and state tax returns, and Defendant had a will prepared which referred to Plaintiff as his "wife." At some point, Plaintiff became a part-time professor at James Madison University, and was known as the "wife" of the Defendant.

Once in Virginia, Plaintiff and Defendant lived together as husband and wife from 1981 until June of 1992, when they began to live in separate residences. Defendant continued to live on Grattan Street in Harrisonburg, which had been the "marital home," while Plaintiff moved to a home Plaintiff and Defendant partially owned in Timberville, Virginia. The eldest son lived with the Defendant all of the time, and the younger son lived with him except for the tenth and eleventh grades, when he lived with his mother in Timberville.

When Plaintiff left the marital residence in 1992, she moved into a farm house in which she and Defendant owned a 50% interest (the other 50% belonging to Plaintiff's sister and brother-in-law). Shortly thereafter, a gentleman moved into the residence and began to cohabit with Plaintiff. Plaintiff claims that she and her male friend lived in the Timberville home, and had a platonic relationship combined with "occasional recreational sex." Plaintiff spent a great deal of time at the hearing attempting to characterize her relationship with her male friend as "not boyfriend and girlfriend" and "occasional sex partners and not an attempt to undermine our marriage," but the overwhelming weight of the evidence was that shortly after leaving the "marital" home, wife commenced cohabiting with her paramour and that they acted both inside and outside the home as a "couple." This relationship apparently lasted for four or five years. There was some inconclusive evidence that Defendant may have become romantically involved with other women after Plaintiff had moved out.

Although the Plaintiff and Defendant had one sexual tryst in October of 1992 after their separation in June of 1992 and Plaintiff came to Defendant's house from time to time to cook dinner for Defendant and the boys a few times a month, the weight of the evidence shows that the Plaintiff and Defendant separated in 1992 with the intent to remain separate and apart.

Plaintiff may have had the subjective intent or desire to resume her relationship with Defendant, but it was clearly not mutual and it clearly never happened.

The plot thickened when in 1997, Defendant met a lady with whom he became romantically involved. Apparently taking the position that he had never been married to Plaintiff, Defendant on June 20, 1999, married his current wife at a formal church ceremony in Staunton, Virginia. At the wedding when the minister asked "does anyone know of any reason this couple should not be joined in holy matrimony," the Plaintiff stood up and let the congregation know that she objected because she was the groom's wife. After the Plaintiff was escorted from the church, Defendant and his current "wife" were married. Shortly thereafter, Plaintiff filed her bill for divorce.

### Did Plaintiff and Defendant Form a Valid Common Law Marriage?

It is well established that Virginia does not recognize a common law marriage, which is formed in the Commonwealth of Virginia. *E.g., Offield v. Davis*, 100 Va. 250 (1902). However, Virginia does recognize as valid a common law marriage formed in accordance with the law of another state which recognizes common law marriage as valid. *E.g., Kelderhaus v. Kelderhaus*, 21 Va. App. 721 (1996); *Farrah v. Farrah*, 16 Va. App. 329 (1993). Both parties concede they have never been formally married pursuant to a license in any state.

Thus, if the parties are to be found to be married, it will have to be because they formed a valid common law marriage in either Illinois or Texas, the only two jurisdictions in which the parties lived prior to taking up residence in Virginia. Ironically, within a few months of their moving to Illinois, the Supreme Court of Illinois in *Hewitt v. Hewitt*, 77 Ill. 2d 49, 394 N.E.2d 1204 (1979), emphatically re-affirmed the Illinois statutory ban on common law marriages, which had been in place since 1905.

Therefore, the only state in which the parties could have formed a common law marriage is Texas. Texas does recognize common law marriage by statute. The applicable Texas statute, which was in force during the relevant time period reads:

> Section 1.91. (a) In any judicial, administrative, or other proceeding, the marriage of a man and woman may be proved by evidence that:

(1) a declaration of their marriage has been executed under Section 1.92 of this code; or

(2) they agreed to be married and, after the agreement, they lived together in this state as husband and wife and there represented to others that they were married.

(b) In any proceeding in which a marriage is to be proved under Subsection (a)(2) of this section, the agreement of the parties to marry may be inferred if it is proved that they lived together as husband and wife and represented to others that they were married.

Texas Family Code Ann. § 1.91 (1970).

The seminal case on the modern statutory law of common law unions in Texas involves the Yankee Hall of Famer, David Winfield. In *Winfield v. Renfro*, 821 S.W.2d 650 (1991), Tex. App. Lexis 2512 (1991), the Court of Appeals of Texas (First District, Houston) was called upon to apply the criteria of §1.91 of the Texas Family Code (1970) for the establishment of a common law marriage in Texas. The *Winfield* Court held that under the statute there are three elements that must be proven to establish a common law marriage in Texas:

(1) An agreement to be married,

(2) Living together *in Texas* as husband and wife; and

(3) Representing to others *in Texas* that they are married.

The law in Texas of common law marriage has been fairly well litigated, and the three elements set forth above have been applied in a number of cases. *See, e.g.*, *Omodele v. Adams*, 2003 Tex. App. Lexis 292 (2003); *Lee v. Lee*, 981 S.W.2d 903 (Tex. Ct. App. 1998); *Grigsby v. Grigsby*, 757 S.W.2d 163 (Tex. Ct. App. 1988).

It has been noted that continuing legislative efforts to abolish common law marriage in Texas have failed, but that the legislature has continually narrowed the basis on which a common law marriage can be formed. *See, e.g.*, *Russell v. Russell*, 865 S.W.2d 929, 931 (Tex. 1993). One case has observed that Texas had begrudgingly tolerated common law marriage: "However, Texas recognition of common law marriages has been described as 'grudging'." *Russell v. Russell*, 865 S.W.2d 929 (Tex. 1993); *Texas Employees Ins. Assn. v. Elder*, 274 S.W.2d 144, 147 (Tex. Civ. App. Fort Worth 1954), *aff'd. on other grounds*, 155 Tex. 27, 282 S.W.2d 371 (1955) ("the law does not favor, but merely tolerates … common law marriages. . . .").

Under Texas law, there is no bright-line rule for the proof of the elements of a common law marriage. *See Russell* at 933 (holding that "section 1.91 [of the Texas Family Code], as amended in 1989, does not require direct evidence of an agreement to be married in order to establish a common law marriage, but that the agreement may be proved by circumstantial evidence"). It appears that the test ultimately is one that relies on the totality of the circumstances. *See, e.g., Eris v. Phares*, 39 S.W.3d 709, 714 (Tex. Ct. App. 2001).

Interestingly, our Court of Appeals in *Kelderhaus v. Kelderhaus*, 21 Va. App. 721 (1996), had the opportunity to apply *Winfield v. Renfro, supra*. In that case, our Court of Appeals held:

> By statute, Texas provides that "the marriage of a man and woman may be proved by evidence that ... they agreed to be married, and after the agreement they lived together in this state as husband and wife and there represented to others that they were married." Tex. Fam. Code Ann. § 1.91(a)(2) (West 1996). The parties must represent to others while in the State of Texas that they are husband and wife. *Winfield v. Renfro*, 821 S.W.2d 640, 648 (Tex. Ct. App. 1991). Residing together as husband and wife in another state does not satisfy the Texas statute. See *Williams v. Home Indem. Co.*, 722 S.W.2d 786, 788 (Tex. Ct. App. 1987). "Strict compliance with these requirements is a necessity, and each one must be established by sufficient proof before [Texas] courts will lend judicial sanction to any assertion ... that ... a [marital] relationship exists." *Middlebrook v. Wideman*, 203 S.W.2d 686, 688 (Tex. Civ. App. 1947).
>
> Here, the record does not support the requisite finding that the parties "lived together ... as husband and wife" in Texas and "there represented to others that they were married." See Tex. Fam. Code Ann. § 1.91(a)(2). The limited testimony that they migrated through Texas as "husband and wife" establishes only a brief, transitory contact with the state which clearly does not constitute "strict compliance" with the statutory requirements. Hence, wife's claim to a valid common-law Texas marriage is without merit.

*Id.* at p. 305.

Under Texas law, the one asserting the existence of a common law marriage has the burden of proving each necessary element of such a marriage. *E.g., Omedele v. Adams*, 2003 Tex. App. Lexis 292 (2003). In this case, the Plaintiff has not carried her burden of proving at least two of the three elements of a Texas common law marriage.

## 1. *Agreement to Be Married*

The Plaintiff and Defendant did not want to be married. In fact, their mutual desire was to form an "ethical" or "spiritual" commitment, as opposed to a marriage. Given the positive evidence that the parties did not want to be married and intentionally avoided marriage, it is hard to see how Plaintiff could carry her burden of proving an agreement to be married. Plaintiff simply did not produce any evidence that the parties intended to be married at the Pecan Street Cafe ceremony or at any other time during the six to eight weeks they remained in Texas.

## 2. *Living Together in Texas as Man and Wife*

The evidence on this point was ambivalent. The parties clearly did not move into a single residence and live as husband and wife after March 10, 1979. They both kept their separate residences during the six to eight weeks they remained in Texas. There is no evidence that they co-mingled their finances while in Texas or purchased any property as husband and wife while they remained in Texas. Although they spent some evenings cohabiting in Texas, they also spent a number of nights apart. While there is no minimum number of nights or days of living together under Texas law to form a common law marriage, the type of arrangement that the parties had may well not reach the level required under Texas law. However, in light of the Court's ruling on elements 1 and 3, there is no need to reach a final resolution of this issue.

## 3. *Representing to Others in Texas That They Were Married*

On this element of common law marriage, there is no credible evidence that the parties represented to others in Texas that they were married. They only lived in Texas for six to eight weeks after the ceremony, and, during that time, the Plaintiff never used the Defendant's surname. While Plaintiff testified that she told friends and co-workers in Texas that she was married, that testimony

is not credible given both parties' strongly expressed desire not to be married. Moreover, the Defendant testified that he never told anyone or implied to anyone that they were married. There was no documentary evidence showing that the parties represented to anyone in Texas that they were husband and wife. More to the point, there is *no* evidence that Defendant held himself out by word or deed as the husband of Plaintiff. Under Texas law, *both* parties must hold themselves out *in Texas* as husband and wife. As the Court stated in *Winfield v. Renfro*:

> [I]t supports Renfro's testimony that in 1983 (not 1982) she (not Winfield) held herself out as married. But Renfro's version of the conversation is no evidence that Winfield held himself out as married in 1982. That is what this record is lacking: evidence that Winfield held himself out as married to Renfro.

821 S.W.2d at p. 650, n. 4 (emphasis added).

Although the parties in this case had more substantive contact with Texas than the parties in *Kelderhaus v. Kelderhaus*, 21 Va. App. 721 (1996), they did not reach the level of proof that is required in Texas to prove a common law marriage.

Therefore, it is hereby ordered, adjudged and decreed that the Bill for a Divorce, *A Vinculo Matrimonii*, be dismissed because the parties were never lawfully married.

In light of the Court's holding, there is no need to address the issues of classification of the parties' property, distribution of the "marital" property, and spousal support.

The Clerk of this Court is directed to send attested copies of this Opinion and Order to Laura S. Evick, Esquire, counsel for the Plaintiff, and to Victor M. Santos, Esquire, counsel for the Defendant.